790 A.2d 798

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v.
PETER PAPASAVVAS, DEFENDANT–APPELLANT.

Argued October 24, 2000—Decided February 14, 2002.

466

*James K. Smith, Jr.*, Assistant Deputy Public Defender, argued the cause for appellant (*Ivelisse Torres*, Public Defender, attorney; *Mr. Smith* and *Claudia Van Wyk*, Deputy Public Defender II, on the briefs).

*Bennett A. Barlyn*, Deputy Attorney General, argued the cause for respondent (*John J. Farmer, Jr.*, Attorney General of New Jersey, attorney).

PER CURIAM.

Last term, we affirmed Peter Papasavvas's conviction and death sentence for the murder of Mildred Place. *State v. Papasavvas*, 163 *N.J.* 565, 751 *A.*2d 40 (2000) (*Papasavvas I*). We preserved his right to challenge the proportionality of his death sentence. *Id.* at 626, 751 *A.*2d 40. We now conclude that Papasavvas was unfairly singled out for the ultimate sanction of death.

 In reaching that conclusion, we remain keenly aware that Papasavvas committed a terrible crime that, standing alone, might legitimately be viewed as deathworthy. Such is not the inquiry on proportionality review, however. Proportionality review is a unique endeavor in our law:

> Unlike direct review, proportionality review does not question whether an individual death sentence is justified by the facts and circumstances of the case or whether, in the abstract, the sentence imposed on a defendant is deserved on a moral level. On the contrary, its role is to place the sentence imposed for one terrible murder on a continuum of sentences imposed for other terrible murders to ensure that the defendant "has not been singled out unfairly for capital punishment."
>
> [*State v. Timmendequas*, 168 *N.J.* 20, 76, 773 *A.*2d 18 (2001) (internal citations omitted) (Long, J., dissenting) (slip op. at 1–2).]

When that singular process is carried out, Peter Papasavvas cannot be condemned to death.

## I. *FACTS*

The facts are set forth in detail in *Papasavvas I, supra,* 163 *N.J.* at 578–83, 751 *A.*2d 40, as modified in *State v. Papasavvas,* 164 *N.J.* 553, 553–54, 753 *A.*2d 1148 (2000) (*Papasavvas II*). We will, however, briefly restate those facts relevant to our proportionality review.

Shortly before nine o'clock in the evening on April 25, 1996, police officers arrived at Papasavvas's home in Iselin, New Jersey to serve an arrest warrant on an unrelated matter. Earlier that day, Papasavvas had been told that his brother had attempted suicide. When Papasavvas saw the officers he fled from his house on foot, dressed only in his underwear.

Four blocks away, he broke into the basement of a house owned by Mildred Place, a sixty-four year-old woman who lived alone. There is no suggestion in the record that Papasavvas knew Mrs. Place personally or even knew about her. Mrs. Place returned home from a church function at approximately ten o'clock that evening. Unaware that Papasavvas was hiding in her basement, she spoke with a friend on the phone until 10:30 p.m. Shortly after that conversation ended, Mrs. Place encountered Papasavvas.

Although what happened next is contested by the parties, we do know that Mrs. Place's body was discovered lying at the bottom of the basement stairs. One of her earrings and two of her sweater buttons were found at the top of the basement stairs, together with her slip and girdle, which had been cut, apparently by a pair of pinking shears. An autopsy revealed that Mrs. Place had sustained multiple physical injuries, including fractured vertebrae and ribs, hemorrhages and abrasions to her back and right side, contusions and abrasions to the bridge of her nose and right cheek, buttocks, and thighs, and extensive bruising. Those injuries, according to the State's experts, were consistent with a fall down the cellar steps. The medical examiner also discovered spermal fluid on Mrs. Place's body. He did not find any evidence of penetration. Based on the foregoing evidence, the Attorney

General and the Public Defender propose different accounts of Mrs. Place's murder.

According to the Attorney General, Papasavvas broke into Mrs. Place's house to obtain clothing. He stole money, credit cards, and a telephone calling card and then heard Mrs. Place return home. Papasavvas emerged from the basement and ambushed her. After knocking her to the floor, he dragged her across the room and asphyxiated her by tying a belt around her head and mouth, thereby impeding her breathing. He then proceeded to cut off her clothes piece by piece. The cuts were straight, indicating that Mrs. Place was motionless at the time. When he finished removing her clothes, Papasavvas sexually assaulted and sodomized Mrs. Place. According to the State, after the sexual assault, Papasavvas strangled Mrs. Place and threw her down to the bottom of the basement stairs where she was found the following day. The State's medical examiner concluded that Mrs. Place died from asphyxiation as a result of the belt pushing her tongue to the side.

The Public Defender offers the following contrary account. Papasavvas broke into Mrs. Place's house to steal clothing and money. When he heard Mrs. Place return home, he decided to remain hidden in the basement until she went to sleep, at which time he planned to slip out of the house unnoticed. That plan went awry, however, when Mrs. Place opened the basement door and surprised Papasavvas, who was still dressed only in his underwear. To prevent her from screaming, Papasavvas placed her in a "sleeper hold." When she lost consciousness, he let her go and she accidentally fell down the basement stairs and broke her neck—an injury so severe that it may have caused her death. Mistakenly believing that Mrs. Place was feigning her death, Papasavvas threatened to sexually assault her so that she would stop pretending. When she did not respond, he proceeded to have sexual contact with her as evidenced by the semen found on Mrs. Place's body during the autopsy. After Mrs. Place's death, Papa-

savvas rummaged through her pocketbook and closets, stealing some clothing, two credit cards, and a telephone calling card.

There is little dispute over the remaining evidence. At 11:15 p.m., Papasavvas used Mrs. Place's telephone to call his own house. Before dialing his phone number, Papasavvas dialed " *67" so that Mrs. Place's phone number would not appear on his call recognition (caller ID) box. The telephone call did, however, appear on Mrs. Place's bill. Papasavvas stole Mrs. Place's automobile and drove to New York City, where he spent the night with Rosa Talbert, a female acquaintance. The next day, Papasavvas and Talbert drove to a liquor store and purchased wine and champagne using Mrs. Place's credit card. Talbert signed the receipt at Papasavvas's request after he told her that the card belonged to his mother. That same day, Papasavvas had his hair cut at a barber shop located in the vicinity of Talbert's apartment. Papasavvas left Talbert's apartment two days later, leaving behind Mrs. Place's clothing. Nineteen days after the murder, Papasavvas turned himself in to the police.

During the guilt phase of the trial, Papasavvas introduced evidence of his life history. Born in Livingston, New Jersey in 1972, Papasavvas was one of four siblings. His childhood is most remarkable for the verbal and physical abuse he endured. Whenever Papasavvas's father, Chris Papasavvas, suspected that any of his sons was misbehaving, he would take all three children downstairs to the basement, strip them, tie them to a column, and beat them with a belt or stick. His father forced Papasavvas and his brothers to shower together, occasionally scalding them with hot water, and was known to squeeze his sons' toes with pliers. Papasavvas's mother and the family pets were also on the receiving end of his father's wrath.

While in junior high school, Papasavvas developed behavioral problems that led to truancy and erratic scholastic performance. Relocating the family to Iselin when defendant was thirteen years old did not improve defendant's adjustment. Seeking social acceptance, Papasavvas was naturally drawn to other adolescents with

similar behavioral problems. Around this time, Papasavvas began abusing alcohol and various drugs, including marijuana, cocaine, LSD, and mescaline.

To support his drug habit, Papasavvas stole car radios and radar detectors from unlocked vehicles. At age fifteen, he was arrested for the first time. Charged with burglary and theft, he received a probationary sentence that he violated. Over the next several years, Papasavvas was repeatedly convicted for shoplifting, theft, and burglary. As the misbehavior increased, so did the abuse at home.

In 1989, Papasavvas dropped out of high school. That same year, he received court-ordered in-patient counseling at the Carrier Clinic for a twenty-day period. Because he suffered from insomnia, flashbacks, hallucinations, and suicidal thoughts, doctors diagnosed him with adolescent adjustment reaction.

In 1993, Papasavvas suffered a serious head injury in a motorcycle accident. He was comatose for nearly three weeks, followed by at least three additional weeks of post-traumatic amnesia. A CT scan revealed that Papasavvas had bilateral frontal traumatic subdural hygromas, a diagnosis that indicates a fluid buildup in both frontal lobes, the area of the brain where high-level reasoning, judgment, and decision making take place. Tests performed in 1997 on Papasavvas's cognitive functioning revealed that his I.Q. had returned to its pre-accident level but that his abstract thinking and judgment had not similarly recovered.

After the motorcycle accident, Papasavvas's personality changed. Although he had shown aggressive characteristics prior to the accident, he began acting violently after he injured himself. In July 1994, for example, he threatened his girlfriend with a knife. Papasavvas's alcohol abuse and criminal activity also escalated.

Not surprisingly, the Public Defender and the Attorney General reached conflicting conclusions regarding Papasavvas's psychiatric condition. Dr. Wilfred Van Gorp testified for the defense that

Papasavvas had suffered a severe brain injury, which included permanent damage to the frontal lobes, temporal lobes, and subcortical structures. He said that the frontal lobe injury further impaired Papasavvas's pre-accident deficiencies in judgment and inhibiting responses. Since his motorcycle accident, the doctor said, Papasavvas acts rather than thinks. Stressful conditions magnify his cognitive deficits. Dr. Arnold Apolito, another defense expert, concluded that Papasavvas's motorcycle accident caused him to suffer a severe organic brain disorder, commonly known simply as brain damage. As a result, according to Dr. Apolito, Papasavvas has cognitive defects, including impaired judgment and an inability to handle unexpected events and stressful situations.

Experts testifying on behalf of the State acknowledged that Papasavvas suffered a moderate to severe head injury in the motorcycle accident, but they concluded that his cognitive functioning had returned to its pre-accident level. Dr. Michael Miller stated that Papasavvas's motorcycle accident did not affect his behavior on the night of the offense. Another expert testifying for the State, Dr. Stanley L. Portnow, diagnosed Papasavvas with antisocial personality disorder and a substance dependence problem, but opined that Papasavvas had recovered from any head injury by the time of the murder. In short, the State's experts testified that the head injury played no role in the murder and that Papasavvas's actions comprised part of a continuum of misbehavior that had begun in his childhood.

The jury convicted Papasavvas of knowing or purposeful murder by his own conduct, felony murder, burglary, robbery, auto theft, and credit-card theft. The jury acquitted Papasavvas of aggravated sexual assault but convicted him of aggravated sexual contact, a lesser-included offense involving touching.

In the penalty phase, the State sought to establish the c(4)(g) (felony murder) and the c(4)(f) (escape detection) aggravating factors. The State relied entirely on the evidence presented at the guilt phase to prove that Papasavvas killed Mrs. Place during

the commission of a burglary or robbery in order to escape detection or apprehension.

Papasavvas relied on the psychiatric testimony offered at trial and introduced additional evidence of the abuse he had endured as a child. Papasavvas's aunt testified that she occasionally visited Papasavvas's home and saw his father abusing him. Papasavvas's brother recounted the beatings that he and his siblings received as children. His brother and mother pleaded with the jury not to sentence Papasavvas to death. In his allocution statement, Papasavvas apologized for killing Mrs. Place, and he too pleaded for his life.

The jury unanimously concluded that the State had established the c(4)(g) (felony murder) aggravating factor. Only five of the twelve jurors found that the State had established the c(4)(f) (escape detection) aggravating factor. Three jurors found the c(5)(a) (extreme emotional disturbance) mitigating factor. The jury unanimously rejected the c(5)(c)(age) and c(5)(d) (diminished capacity) mitigating factors.

With respect to the c(5)(h) (catch-all) mitigating factor, ten jurors found that Papasavvas was subjected to cruelty as a young child; all twelve jurors found that Papasavvas's school system classified him as emotionally disturbed; seven found that his emotional disturbance was at least partly due to cruelty he had experienced as a child; all twelve jurors found that he suffered from a mental defect, disorder, or other mental disturbance; two jurors found an undesignated factor that warranted mercy; and all twelve rejected the remaining catch-all factors.

The jury unanimously determined that the felony-murder aggravating factor outweighed the mitigating factors beyond a reasonable doubt. Accordingly, the court sentenced Papasavvas to death. The trial court also imposed sentences on the noncapital offenses of second-degree burglary and second-degree robbery.

The Court affirmed Papasavvas's conviction and death sentence on direct appeal. *Papasavvas I, supra*, 163 *N.J.* at 630, 751 *A.*2d

40. In addition, the Court vacated Papasavvas's non-capital sentences and remanded for sentencing. *Id.* at 627, 751 *A.*2d 40. Subsequently, the Court denied Papasavvas's motion for reconsideration.

## II. *INDIVIDUAL PROPORTIONALITY REVIEW*

The Court conducts proportionality review to ensure that a specific defendant's death sentence is not disproportionate when compared to similarly situated defendants. *State v. DiFrisco,* 142 *N.J.* 148, 160, 662 *A.*2d 442 (1995) (*DiFrisco III* ); *N.J.S.A.* 2C:11–3e. "A capital sentence is excessive and thus disproportionate if other defendants with characteristics similar to those of the defendant under review generally receive sentences other than death for committing factually-similar crimes in the same jurisdiction." *State v. Martini,* 139 *N.J.* 3, 20, 651 *A.*2d 949 (1994) (*Martini II* ); *accord State v. Morton,* 165 *N.J.* 235, 243–44, 757 *A.*2d 184 (2000) (*Morton II* ).

The first step in proportionality review is to determine the universe of cases against which the defendant's case will be compared. *Morton II, supra,* 165 *N.J.* at 245, 757 *A.*2d 184; *DiFrisco III, supra,* 142 *N.J.* at 162, 662 *A.*2d 442. "We will ... consider all death-eligible cases, whether or not they were capitally prosecuted, because the State's decision not to prosecute the defendant capitally does not necessarily reflect on [the] defendant's lack of deathworthiness." *Morton II, supra,* 165 *N.J.* at 245, 757 *A.*2d 184. In this case, the Court relies on a universe of cases assembled by the Administrative Office of the Courts (AOC) in the *Papasavvas Report.* The proportionality universe currently includes a total of 455 death-eligible cases, 176 of which proceeded to a penalty trial. *Papasavvas Report,* tbl. 7. Of the 176 cases that reached the penalty phase, fifty-two, or 29.5%, resulted in a death sentence. *Ibid.* The overall death-sentencing rate is 11.4% (52/455). *Ibid.*

■ Proportionality review consists of two steps: frequency analysis and precedent-seeking review. Each must be addressed separately.

## A. *FREQUENCY ANALYSIS*

■ In frequency analysis, the Court "seeks[s] to determine ... whether there is a societal consensus that the defendant in the case before us is sufficiently culpable such that his sentence may be deemed not aberrational." *State v. Chew*, 159 *N.J.* 183, 201, 731 *A.*2d 1070 (1999), *cert. denied*, 528 *U.S.* 1052, 120 *S.Ct.* 593, 145 *L.Ed.*2d 493 (1999) (*Chew II*). The Court conducts frequency analysis by relying on the salient-factors test, a measurement of the relative frequency of death sentences in factually similar cases. *Morton II, supra*, 165 *N.J.* at 245, 757 *A.*2d 184. Under the salient-factors test, every death-eligible case is assigned to one of thirteen categories based on the statutory aggravating factors.[1] *Id.* at 246, 757 *A.*2d 184. We then subdivide that group "according to circumstances that serve either to aggravate or to mitigate the blameworthiness of the defendants in those cases." *State v. Loftin*, 157 *N.J.* 253, 328, 724 *A.*2d 129 (1999) (*Loftin II*) (quoting *Martini II, supra*, 139 *N.J.* at 33, 651 *A.*2d 949) (internal quota-

---

1 The thirteen categories are:

(A) Victim is a Public Servant:

(B) Prior Murder Conviction without A above;

(C) Contract Killing without A–B above;

(D) Sexual Assault without A–C above (subdivided into (1) aggravated and (2) other);

(E) Multiple Victims without A–D above (subdivided into (1) aggravated and (2) other);

(F) Robbery without A–E above (subdivided into (1) home, (2) business, and (3) other);

(G) Torture/Depravity without A–F above;

(H) Abduction without A–G above;

(I) Arson without A–H above;

(J) Escape Detection without A–I above;

(K) Burglary without A–J above;

(L) Grave Risk of Death to others without A–K above; and

(M) Victim Under 14 Years Old without A–L above.

tions omitted). In the present case, the State and Papasavvas cannot agree on the appropriate category for salient-factors review. The State contends that this case should be assigned to the F-1 cell—murder committed during a residential robbery. Papasavvas, on the other hand, argues that this case belongs in the K cell—murder committed during a burglary. For the reasons that follow, we conclude that this case should be assigned to the F-1 cell.

As noted previously, the State submitted two aggravating factors to the jury: (1) Papasavvas murdered Mrs. Place to escape detection for burglary or robbery, and (2) Papasavvas murdered Mrs. Place during the commission of a burglary or a robbery. Only five of the twelve jurors found the "escape detection" aggravating factor, but the jury unanimously agreed that Papasavvas murdered Mrs. Place during a burglary *and* a robbery. Papasavvas nevertheless contends that this case should be assigned to the burglary cell because the robbery was a mere afterthought, and it was actually the burglary that led to Mrs. Place's death.

Clearly, a robbery occurred under *N.J.S.A.* 2C:15-1 regardless of whether Papasavvas stole Mrs. Place's belongings before or after he murdered her and, based on the jury's verdict, Papasavvas murdered Mrs. Place during both a robbery and a burglary. As a result, this case could be assigned either to the F-1 cell or the K cell. The Court's consistent practice has been to abide by the principle of unique assignment. "Briefly stated, the principle is that even though a case may contain multiple identifying factors, (*e.g.,* killing a public official and robbing or torturing the official,) the case is assigned to one category for salient-factor review." *In re Proportionality Review Project,* 161 *N.J.* 71, 89, 735 *A.*2d 528 (1999). Specifically, the case is assigned to the most aggravated category. *State v. Harris,* 165 *N.J.* 303, 316, 757 *A.*2d 221 (2000) (*Harris II*). The main rationale in support of the principle of unique assignment is that juries generally are swayed by the most aggravating characteristic in a case. Statistics show that juries impose the death penalty in robbery cases but not in

burglary cases.[2] Consequently, we assign Papasavvas's case to the F–1 subcategory—murder committed during a robbery in a home.[3]

In the F–1 subcategory, there are currently fourteen cases. The following chart represents a breakdown of the death sentencing rates for defendants in the F–1 subcategory.

SALIENT FACTORS TEST: F 1 SUBCATEGORY

| | Proportion of Cases Advancing To Penalty Trial | Death–Sentencing Rate at Penalty Trial | Death–Sentencing Rate for All Eligible Cases |
|---|---|---|---|
| F–1 Incl D. | 28.0% (14/50) | 35.7% (5/14) | 10.0% (5/50) |
| F–1 Excl. D. | 26.5% (13/49) | 30.8% (4/13) | 8.2% (4/49) |
| All Ds | 38.7% (176/455) | 29.5% (52/176) | 11.4% (52/455) |
| All Ds Excl. D. | 38.5% (175/454) | 29.1% (51/175) | 11.2% (51/454) |

The statistics do not demonstrate a societal consensus for or against the use of the death penalty in cases falling within the F–1 category. Prosecutors seem to view F–1 cases as somewhat less deathworthy than the norm. Including Papasavvas, 28% of F–1 cases proceeded to penalty trial, whereas 38.7% of all death-eligible cases proceeded to penalty trial. Excluding Papasavvas, 26.5% of F–1 cases proceeded to penalty trial, whereas 38.5% of all death-eligible cases proceeded to penalty trial.

On the other hand, the death-sentencing rate at penalty trials in F–1 cases is on a par with the overall rate, suggesting that juries

---

[2] The penalty trial death-sentencing rate is 29% (12/41) in robbery cases. *Papasavvas Report*, tbl. 7. In burglary cases, the death-sentencing rate at the penalty phase is 0% (0/4). *Ibid.*

[3] Judge David S. Baime, who acted as the Special Master in this case noted that even under Papasavvas's version of the events, there remains a "sufficient nexus" between the theft and the killing to support placing this case into the F–1 cell. *Papasavvas Report* at 10. The AOC agreed with Judge Baime, and this Court generally defers to the expertise of the AOC, "particularly to its unique assignment of defendants to only one comparison category." *DiFrisco III, supra,* 142 *N.J.* at 167, 662 A.2d 442.

view F–1 cases as average in terms of death worthiness. Including Papasavvas, 35.7% of F–1 penalty trial cases resulted in a death sentence, as compared with 29.5% of all death-eligible penalty trial cases. Excluding Papasavvas, the difference is reduced: 30.8% of F 1 penalty trial defendants received the death penalty, compared with 29.1% of all death-eligible penalty trial cases.

Finally, the percentage of F–1 defendants who received the death penalty is slightly lower than the overall percentage. Including Papasavvas, 10% of F–1 defendants were sentenced to death, compared with 11.4% of all death-eligible defendants. Excluding Papasavvas, 8.2% of F–1 defendants were sentenced to death, compared to 11.2% of all death-eligible defendants.

Because the statistics do not demonstrate a societal consensus for or against the use of the death penalty in F–1 cases, we must "give enhanced weight to the process of precedent-seeking review." *State v. Cooper*, 159 *N.J.* 55, 88, 731 *A.*2d 1000 (1999) (*Cooper II* ).

### B. *PRECEDENT–SEEKING REVIEW*

The second step in conducting proportionality review consists of precedent-seeking review, wherein the Court "examine[s] death-eligible cases similar to defendant's case to determine whether his death sentence is aberrant when compared to the sentences received by defendants in those other cases." *Chew II, supra*, 159 *N.J.* at 209–10, 731 *A.*2d 1070. The goal of precedent-seeking review is "to ensure that the defendant has not been 'singled out unfairly for capital punishment.' " *Cooper II, supra*, 159 *N.J.* at 88, 731 *A.*2d 1000 (quoting *Martini II, supra*, 139 *N.J.* at 47, 651 *A.*2d 949). Although precedent-seeking review is intended to complement frequency analysis, *DiFrisco III, supra*, 142 *N.J.* at 184, 662 *A.*2d 442, we traditionally have placed greater reliance on precedent-seeking review. *Cooper II, supra*, 159 *N.J.* at 70, 731 *A.*2d 1000.

Both precedent-seeking review and frequency analysis, especially the salient-factors component, are fact-driven. Reliance upon the facts of the case presents a unique challenge here, because the Attorney General and the Public Defender continue to dispute certain facts: whether Papasavvas was surprised by Mrs. Place or ambushed her; whether he raped Mrs. Place or had some other form of non-invasive sexual contact with her; whether he threw her down the stairs deliberately; and whether he stole her property before or after the murder.

Because the events in this case must be compared to the events that took place in other cases in order to carry out precedent-seeking review, the Court must determine the appropriate version of events to evaluate. In so doing, we do not attempt to replicate the jury's deliberative process, an activity that is plainly beyond our purview. Rather, we accept as given all uncontroverted facts and, where facts are disputed, we extract from the jury's findings of guilt and innocence the version of events essential to the verdict. The reason we do that is because we can be sure that the State proved those facts beyond a reasonable doubt. Under that standard, the jury's verdicts resolve all but one factual dispute.

The conviction for aggravated sexual contact and acquittal of aggravated sexual assault indicate that the jury found only some form of non-invasive sexual touching. It is also apparent from the jury's verdict that Papasavvas deliberately threw Mrs. Place down the stairs. In order for Papasavvas to have been found death-eligible, the jury must have found that, by his own conduct, he purposely or knowingly caused the death of Mrs. Place or intended serious bodily injury, knowing that it was highly probable that death would result from the injury. *State v. Cruz,* 163 *N.J.* 403, 417–18, 749 *A.*2d 832 (2000).

Because the jury found only the felony-murder aggravating factor and rejected the escape-detection aggravating factor, it can be inferred that the jury found that the murder happened in the course of a robbery or burglary but not that the robbery or burglary occurred before the murder. If Papasavvas had stolen

the property first, the escape detection aggravating factor would have followed logically from that conclusion. Thus, it is reasonable to infer that the jury believed Papasavvas to have taken Mrs. Place's property after the murder.

The only fact still disputed by the parties but not resolved by the jury's verdict is whether Papasavvas ambushed Mrs. Place or was surprised by her. If the reason we accept all of the facts that are essential to the jury's verdict is because we can be sure the State bore its burden of proving those facts beyond a reasonable doubt, it follows that where, as here, the verdict does not provide such assurance, the State's version should not prevail.

Our dissenting colleague relies upon the acquittal motion and the motion for judgment notwithstanding the verdict (j.n.o.v.) paradigms to establish the factual record in this case, essentially giving the benefit of the doubt to the State. Post at 521–22. Adoption of those standards is improper for several reasons. When an appellate court reviews j.n.o.v. and acquittal motions, the inquiry is whether the evidence at trial supported the jury's verdict. The appellate court's function is to determine whether a reasonable jury "could have" made the findings at issue in light of the evidence presented. In that context, it makes sense to cast the burden on the movant and confer the benefit of the doubt on the non-moving party. The inquiry on proportionality review is much different. The Court does not assess the jury's verdict to determine its reasonableness. Rather, we compare a defendant's circumstances to similar cases to determine whether the sentence is proportional. The standards of review applied to j.n.o.v. and acquittal motions have no resonance in a proportionality review inquiry. In this respect, we agree with the concurring opinion of Justice Stein that explicates that a proportionality review does not implicate the reasonableness of a death sentence but rather investigates its comparative proportionality to similarly situated defendants. Post at 514–15.

Our dissenting colleague's use of the j.n.o.v. and acquittal motions standards presumably flows from the fact that the burden

shifts to a defendant in proportionality review to prove that he has been unfairly singled out for capital punishment. *Morton II, supra*, 165 *N.J.* at 235, 757 *A.*2d 184. Indeed, the burden is cast upon the defendant in proportionality review. However, the unique situation confronting us is to determine the factual predicate for the proportionality review. The burden shifts to Papasavvas only after the facts have been established, at which point the proportionality review inquiry begins. Thus, a presumption in favor of the defendant is the vantage point from which the issue must be resolved.

As we have indicated, only one fact that is disputed cannot be resolved by the application of logic to the verdict: whether Mrs. Place was ambushed by Papasavvas or he was surprised by her. Because the issue is contested and neither version of the facts is essential to the verdict, we must assume that Papasavvas was surprised by Mrs. Place while he hid in her basement. That is the factual backdrop from which our analysis will flow.

## 1. *RELEVANT FACTORS*

We divide criminal culpability into three categories: the defendant's moral blameworthiness, the degree of victimization, and the defendant's character. *See, e.g., Chew II, supra*, 159 *N.J.* at 210, 731 *A.*2d 1070. The components by which we measure a defendant's culpability are not disputed. In fact, they are catalogued in minute detail in our cases:

1. Defendant's moral blameworthiness
 a. Motive
 b. Premeditation
 c. Justification or excuse
 d. Evidence of mental disease, defect or disturbance
 e. No Knowledge of victim's helplessness
 f. No Knowledge of effects on nondecedent victims
 g. Defendant's age
 h. Defendant's involvement in planning the murder
2. Degree of victimization
 a. Violence and brutality of the murder
 b. Injury to nondecedent victim

3. Character of defendant
 a. Prior record
 b. Other unrelated acts of violence
 c. Cooperation with authorities
 d. Remorse
 e. Capacity for rehabilitation.

[*State v. Harvey*, 159 *N.J.* 277, 309, 731 *A.*2d 1121 (1999) (*Harvey III* ) (citing *State v. Marshall*, 130 *N.J.* 109, 155, 613 *A.*2d 1059 (1992) (*Marshall II* )).]

It would be fair to say that the foregoing list is a manifesto of the matters that are at the heart of a judgment regarding culpability—the assessment of good versus evil.

### a. *DEFENDANT'S MORAL BLAMEWORTHINESS*

With respect to moral blameworthiness, we examine "motive, premeditation, justification or excuse, evidence of mental disease, defect or disturbance, knowledge of helplessness of the victim, knowledge of effects on nondecedent victims, defendant's age, maturity, etc., and defendant's involvement in planning the murder." *Chew II, supra* 159 *N.J.* at 210–11, 731 *A.*2d 1070.

Papasavvas has been placed in the F–1 category—murder during the commission of a robbery. Among robbery cases, Papasavvas's motive for pecuniary gain is on the low end of the spectrum: his crime was not a contract killing, *State v. Marshall*, 123 *N.J.* 1, 28, 586 *A.*2d 85 (1991) (*Marshall I* ), *DiFrisco III, supra*, 142 *N.J.* at 210, 662 *A.*2d 442; it was not a murder resulting from a kidnaping for ransom, *Martini II, supra*, 139 *N.J.* at 74, 651 *A.*2d 949, nor was it an insurance killing, *Chew II, supra*, 159 *N.J.* at 226, 731 *A.*2d 1070. Murders like Papasavvas's, that occur in the course of a felony, are strikingly common. Indeed, according to statistics provided by the AOC, since 1983 74% of cases in the death-eligible universe have the c(4)(g) aggravating factor. In 2000, 100% of the cases included that factor either alone or in conjunction with other factors. At the very least then, because it is so widespread, cases that have only the 4(g) factor require particular scrutiny. In addition, we note that the murder was not premeditated, at least not in advance of Papasavvas's entry into

the Place home. The record does not suggest any justification or excuse for Papasavvas's crime.

Papasavvas offered extensive evidence of brain damage and psychological impairments including a serious head injury sustained during a motorcycle accident. Although the jury unanimously rejected Papasavvas's claim of diminished capacity (c(5)(d)), within the catch-all factor all twelve jurors found that Papasavvas suffered from a mental defect or other mental disorder.

Papasavvas also presented considerable evidence of child abuse, and ten jurors found that Papasavvas was subject to cruelty as a child. All twelve jurors found that the school district in which Papasavvas was enrolled classified him as emotionally disturbed. Seven jurors found that his emotional disturbance was attributable in part to the abuse he suffered as a child.

Mrs. Place was vulnerable due to her advanced age and the fact that she lived alone. There is no evidence, however, that suggests Papasavvas was aware of those vulnerabilities when he broke into the basement. There was no evidence of provocation.

Although Papasavvas was twenty-three years old at the time of the murder, the jury unanimously rejected the c(5)(c)(age) mitigating factor. Nevertheless, we assign some mitigating weight to his age due to the effect it might have had on the jury's evaluation of the c(5)(h) (catch-all) mitigating factors. *See State v. Bey,* 137 *N.J.* 334, 360, 645 *A.*2d 685 (1994). Assessing all of those facts, we find Papasavvas's moral blameworthiness to be moderate.

b. *DEGREE OF VICTIMIZATION*

We evaluate victimization by examining the "violence and brutality of the murder, and injury to nondecedent victims." *Chew II, supra,* 159 *N.J.* at 211, 731 *A.*2d 1070.

Papasavvas assaulted Mrs. Place. To prevent her from screaming, he tied a belt around her mouth, which made it difficult for her to breathe. After choking her, he threw her body down the stairs. Finally, he cut off her clothes piece by piece and had some

sort of sexual contact with her. Because it is unknown at what point Mrs. Place died in the attack, we are unable to assess her level of suffering. However, the Court has held that even short periods of suffering are sufficient to increase the degree of victimization. *See Cooper II, supra,* 159 *N.J.* at 91, 731 *A*.2d 1000; *Harvey III, supra,* 159 *N.J.* at 314, 731 *A*.2d 1121; *Loftin II, supra,* 157 *N.J.* at 338, 724 *A*.2d 129. We note that, though terrible, Mrs. Place's injuries, when viewed against the backdrop of the horrific acts of gratuitous violence that inhabit the death penalty universe, are not among the most egregious. Nevertheless, the degree of victimization overall was high.

## c. *DEFENDANT'S CHARACTER*

Finally, we consider Papasavvas's character, which includes his "prior record, other unrelated acts of violence, cooperation with authorities, remorse, and capacity for rehabilitation." *Chew II, supra,* 159 *N.J.* at 211, 731 *A*.2d 1070. Papasavvas has both a juvenile record and an adult record. As an adult, he has nine convictions for such offenses as burglary, larceny, receiving stolen property, and unlawful possession of a weapon. As a juvenile, Papasavvas had two adjudications for delinquency, beginning at age fifteen, for burglary and thefts. His criminal history increases his culpability. However, that is offset by the absence of violent offenses prior to this offense.

Papasavvas did not immediately cooperate with the authorities. After three weeks had passed, he finally turned himself into the police. He confessed to his psychiatrists that he killed Mrs. Place, but he claimed that she accidentally fell down the basement stairs. That diminishes the weight to be accorded to his confession. *Cooper II, supra,* 159 *N.J.* at 91, 731 *A*.2d 1000. He expressed remorse for the crime, albeit belatedly. Waiting until allocution to express remorse when facing the prospects of a death sentence diminishes the value of that remorse. *Ibid.*

Although Papasavvas's capacity for reform is questionable, his criminal history, the lack of violence in his criminal record, his

remorse, and his age indicate that he may well have the potential for rehabilitation.

### d. CONCLUSION

Of the fifteen considerations that underlie this analysis, eleven clearly support Papasavvas. The crime was not premeditated; Papasavvas is brain damaged and suffered horrific child abuse; there is no evidence that Papasavvas had reason to know of Mrs. Place's vulnerability or even that she would be at home; Papasavvas was not aware of the non-decedent victims who would be affected by his actions; he was only twenty-three years old at the time of the crime; he did not plan it; he did not injure a non-decedent victim; his prior record is a non-violent one; he ultimately gave himself up; he expressed remorse for his crime and there is nothing to suggest that he is beyond redemption. Accordingly, we find Papasavvas's overall culpability to be moderate based on the three-part model of criminal culpability.

### 2. PAPASAVVAS'S COMPARISON GROUP

■ "In precedent-seeking review we use the same comparison group that was used in the salient-factors test." *State v. Feaster*, 165 *N.J.* 388, 407, 757 *A.*2d 266 (2000); *accord Chew II, supra*, 159 *N.J.* at 214, 731 *A.*2d 1070. The Court examines cases that are factually similar to the defendant's case to determine "[w]hether defendant's sentence is disproportionate in comparison with the culpability levels of the comparison group." *Loftin II, supra*, 157 *N.J.* at 339, 724 *A.*2d 129.

### a.

Before engaging in our comparisons, we note the following trenchant observation that is the State's point of departure for its analysis of the comparisons of Papasavvas's case to those in the F–1 category:

Initially, the State notes that the aforementioned death and life-sentenced cases cannot accurately be described as genuinely comparable since none of the defendants discussed above sexually attacked their victims in addition to robbing and killing them. In marked contrast, defendant, as found by the jury, perpetrated what this Court accurately described as "bizarre and repulsive" conduct against

Mildred of a distinctly sexual nature, including making "very straight [scissor] cuts of clothing to leave exposed her private parts, and by ejaculating near her anus. Even prior to this Court's decision, the AOC specifically denoted as a special aggravating feature of the offense that defendant had subjected his victim to "sexual perversion or abuse other than rape.

[*Report* at 42a.]

If, as the State suggests, sexual contact is the critical path to declaring Papasavvas's sentence proportional, then under the principle of unique assignment, and our practice of assigning cases on the basis of the most aggravating characteristic, Papasavvas should have been compared to other cases in which a murder was committed involving a sexual crime against a vulnerable victim. *Harris II, supra,* 165 *N.J.* at 316, 757 *A.*2d 221. At the very least, those cases should be considered to verify the outcome of the F–1 comparisons.

The recent case of *State v. Timmendequas, supra,* 168 *N.J.* 20, 773 *A.*2d 18 (2001) is instructive. There, the Court compared defendant to, among other cases, those in which the victims were vulnerable because they were elderly. Those cases, that are factually more similar to this case than the F–1 cases, include: (1) Kevin Conley, who broke into the home of his eighty-seven year-old victim and beat, raped, stabbed, and fatally strangled her; (2) Frank Masini, who first went to his eighty-five year-old aunt's home, stabbed her in the neck, and vaginally and anally raped her, and two weeks later did the same thing to another eighty year-old relative from whom he then stole a ring; (3) Samuel Mincey, who broke into the home of his seventy-three year-old victim, beat her severely, raped her, and strangled her, and then stole two oriental dolls and a television; (4) Rafael Rivera, who beat and strangled his seventy-eight year-old next door neighbor when she unexpectedly returned to her apartment and found him looking around for money; and (5) Otis James, who, after assaulting one woman, proceeded to rape and smother her eighty-two year-old upstairs neighbor. Not a single one of those plainly more culpable defendants had mitigating evidence nearly as compelling as that of Papasavvas. Yet not one of them received the death penalty. In

fact, only one, Rivera, was even capitally prosecuted. We find Papasavvas's sentence aberrant when compared to the sentences of those individuals.

Among the other cases to which defendant should be compared, if only because of the State's focus on the sexual contact evidence, are similar cases in the D–2 category, which consists of "non-aggravated" sexual-assault murders. *Harris II, supra*, 165 *N.J.* at 317, 757 *A.2d* 221. Of the twelve cases in that category, only one received a death sentence. That was Ambrose Harris, who deliberately carjacked his victim, took her to a secluded area and sodomized her, shot her in the back of the head as she tried to get out of the car trunk where he had imprisoned her, and later shot her again in the face. That Harris's culpability far exceeds that of Papasavvas is obvious.

The remaining similar D–2 cases received sentences of either a term of years or life. They include Robert Bolinger who stalked his victim, entered her apartment through the window, hid in the closet until he was observed and then stabbed the victim, bound her and sexually assaulted her. Thereafter, he took her wallet and fled. Bolinger claimed as mitigation an alcohol and drug abuse problem. He was charged with murder, felony murder, aggravated sexual assault, robbery, burglary and possession of a weapon for an unlawful purpose. He pled guilty to felony murder and aggravated sexual assault and received a life term.

Founcill Brockington entered the home of his victim, sexually assaulted and strangled her, and struck her on the head with a pointed object. His mitigation was cocaine use and no prior record. He pled guilty to aggravated manslaughter and was sentenced to twenty-five years with eight years of parole ineligibility.

Jerry Spraggins broke into his sixty-eight year-old victim's home and sexually assaulted her. To silence her, he put a pillow over her face and smothered her. He then took his victim's purse and a gold chain and left through the window. He had a long criminal record and little mitigating evidence. He was convicted

of burglary, aggravated sexual assault, and felony murder, and received a life term with a thirty year parole disqualifier for murder, with consecutive terms on the other offenses.

If those are the comparison cases, Papasavvas's death sentence is clearly disproportionate.

b.

Returning to the F–1 category, the parties agree on ten cases for purposes of precedent-seeking review.[4] We agree that these cases should be included in defendant's comparison group and adopt all ten cases. The defendants are Alvin Adams, Jerry Britton, Alphonso Brunson, Jesus DeJesus, Nathaniel Harvey 1A, Nathaniel Harvey 2A,[5] Franklin Flowers Hudson, Timothy Paul Lee, Gerald E. Williams, and Thomas Wolfe.

The Public Defender has submitted a list of five additional cases to which the Attorney General objects. The defendants are Larry Durden, Albert Fains, Michael Jones, Harold Perry, and Charles Ploppert. All five belong in the F–1 category, and could be included because they share a substantial characteristic with Papasavvas's case (in addition to the common salient factor). *Morton II, supra*, 165 *N.J.* at 256, 757 *A.*2d 184. We decline to include Jones because his crime bears little resemblance to Papasavvas's crime other than the common salient factor that the murders were committed during the course of a residential robbery. The Court includes the four remaining cases, Larry Durden, Albert Fains, Harold Perry, and Charles Ploppert in Papasavvas's comparison group.[6]

The Attorney General has submitted an additional eight cases to which the Public Defender objects. They are Wayne Busby,

---

[4] Although the Public Defender argued that this case should be assigned to the K cell, he submitted a contingency list of cases from the F–1 cell that could be used for precedent-seeking review.

[5] We treat Nathaniel Harvey's two penalty trials as separate comparison cases.

[6] Extended summaries of these cases are provided in Appendix A.

Aaron Huff, Dwayne Mann, Keith McNeil, Inocenzio Mendez,
Thomas Reigle, Samuel Rodriguez, and George Schaffer. All
eight cases belong in the F–1 sub-category. The Court declines to
include Mann and McNeil in Papasavvas's comparison group,
however, due to a lack of similarity between the crimes. The
Court also declines to include Mendez, whose level of mental
retardation distinguishes his case from the rest of the comparison
group. The Court includes the remaining five cases in Papasav-
vas's comparison group.[7] Thus, we consider nineteen cases over-
all.

### c. *COMPARISON OF AGREED–ON CASES*

Of those defendants in the agreed-on group, only one, Nathaniel
Harvey, received a death sentence, and he is far more culpable
than Papasavvas. Although Papasavvas was found guilty of sexu-
al contact, Harvey's first jury (he was sentenced to death on two
occasions) indicated by its C(4)(c) finding (torture/depravity) that
his crime was much more brutal. He inflicted sixteen wounds on
his victim, whose teeth and jaw were broken and whose skull was
split open by a hammer or lead pipe. After murdering her,
Harvey washed her body and changed the bloody sheets on her
bed to avoid detection. When we reviewed Harvey's proportional-
ity claim, we also emphasized that the break-in of his victim's
apartment was "not an impulsive act" and that he "previously had
committed numerous burglaries." *Harvey III, supra,* 159 *N.J.* at
318, 731 *A.*2d 1121. Likewise, Harvey could not have been
surprised by his victim because he burglarized her bedroom at
night. With respect to his character, we found that it

contributes greatly to his moral blameworthiness. Defendant's prior record is
extensive and involves convictions for serious, violent crimes. On May 31, 1979,
defendant pleaded guilty to rape, atrocious assault and battery. In October 1988,
he pleaded guilty to first degree kidnaping and aggravating sexual assault. He
also pleaded guilty to second degree attempted kidnaping, second degree burglary,
and third degree burglary. He also was convicted of receiving stolen property.
Defendant has broken into homes other than Schnaps's: on the day of his arrest he
broke into two homes. In one house, he attacked a couple with an ax; in another,

---

[7] Extended summaries of these cases are provided in Appendix A.

he attempted to abduct a teenaged girl. Also, he later confessed to committing a number of burglaries in West Windsor. *Harvey II, supra,* 151 *N.J.* at 117, 699 *A.*2d 596. Suffice it to say, Nathaniel Harvey is a very dangerous man who has kidnaped, raped, robbed and killed.

 With respect to remorse, there is scant, if any, evidence of it. In his statement in allocution, he expressed no remorse for murdering Irene. Nor did he express any shame or humility for the pain and suffering he inflicted in Schnaps's family.

 Finally, there in little hope of rehabilitation for Harvey. His prior record reveals that he has chosen for himself a life of violent crime. He has multiple convictions for rape, assault and kidnaping. The murder of Irene Schnaps was the culmination of an escalating pattern of violence. Defendant had been paroled in May 1983 for his sentence of fifteen to twenty years for rape. Irene Schnaps was killed a little over two years later. Unfortunately, his four years in prison had little deterrent or rehabilitative effect on defendant.

 [*Harvey III, supra,* 159 *N.J.* at 314–15, 731 *A.*2d 1121.]

By contrast, Papasavvas' break-in of Mrs. Place's home appears to have been impulsive, and he killed her after she surprised him as he was hiding in her basement. Moreover, Harvey was significantly older than Papasavvas, did not suffer from a mental disease or defect, and was not abused as a child. Finally, unlike Papasavvas, Harvey did not express remorse for his crime.

We conclude that Harvey's age, character, violent record, brutal crime and lack of capacity for rehabilitation render him far more culpable and more deathworthy than Papasavvas and that his sentence supports Papasavvas's disproportionality contention.

In certain respects, Alvin Adams, the first agreed-on life-sentenced defendant, also is more culpable than Papasavvas. Unlike Papasavvas, Adams planned his burglary and knew in advance that the victim was an elderly female. Adams also had a record of prior violent offenses and was thirty-three years old at the time of the murder. On the other hand, Adams did not have sexual contact with his victim. Further, Adams was diagnosed as mentally retarded. We thus conclude that Adams's life sentence does not support Papasavvas's claim of disproportionality.

The degree of victimization in Jerry Britton's case was at least as high as in Papasavvas's case. Britton unexpectedly confronted his victim when he broke into her home for the second time. He then choked and punched her before stabbing her sixteen times.

In addition, the police found her naked from the waist down, indicating that some type of sexual abuse had occurred. On the other hand, apart from his drug addiction, Britton's case contains virtually none of the mitigating evidence present here, in particular the evidence of brain damage, child abuse, and mental illness. Therefore, life-sentenced Britton is more deathworthy than Papasavvas and supports Papasavvas's disproportionality claim.

There are substantial similarities between Alphonso Brunson and Papasavvas. Both men endured child abuse and displayed signs of emotional and psychological disturbance. In addition, both men were in their early twenties when they committed their respective murders and had prior criminal records. Although, Brunson is more culpable in that he never confessed to murdering the victim, he murdered his victim in a less brutal manner and there was no evidence of sexual abuse. Therefore, Brunson's life sentence provides limited support for Papasavvas's disproportionality claim.

The degree of victimization in Jesus DeJesus's case is similar to Papasavvas's. Although DeJesus did not sexually abuse his victim, he stabbed her and set her apartment on fire before leaving with some of her jewelry. Like Papasavvas, DeJesus had a prior criminal record. However, DeJesus was considerably older than Papasavvas and had little by way of mitigating evidence. He was drinking regularly around the time of the murder, but he denied having a drug problem. In addition, there was no evidence of child abuse, brain damage, or emotional disturbance. DeJesus's life sentence supports Papasavvas's claim of disproportionality.

Franklin Flowers Hudson's moral blameworthiness is similar to Papasavvas's moral blameworthiness. Both individuals acted out of a pecuniary motive and were approximately the same age at the time of their respective crimes. Although Hudson did not have a history of mental disease, he was under the influence of cocaine and alcohol when he attacked his victim. With respect to degree of victimization, Hudson stabbed his victim and struck him over the head with a baseball bat. Hudson also tied up and gagged

another individual during the robbery. As for character, Hudson cooperated with authorities by admitting to everything except stealing the homeowner's jewelry. By comparison, Papasavvas continues to contend that Mrs. Place's death was an accident. Hudson and Papasavvas both have criminal records. In short, Hudson and Papasavvas are roughly equivalent. Thus, Hudson's life sentence supports Papasavvas's claim of disproportionality.

Timothy Lee had no history of mental disease, but was addicted to heroin when he committed his murder. In contrast to Papasavvas, the degree of victimization was low in Lee's case. The victim died from a single stab wound to the chest. Like Papasavvas, Lee had a prior criminal record. Due primarily to the degree of victimization, Lee's sentence does not support Papasavvas's claim of disproportionality.

Unlike Papasavvas, Gerald Williams entered the apartment of his victim intending to steal, fully aware of the fact that someone was home. Williams's case is further distinguished by his age (thirty-four at the time of the murder) and the lack of any evidence of child abuse or mental illness. However, Williams was drinking on the night of the murder, and so the AOC coded the c(5)(d) (mental disease, defect, or intoxication) factor as being present. Of greater significance, he threw the victim out a third floor window to his death on the pavement and allowed his eight year-old daughter to watch as he committed the crime. Williams also did not confess to the murder. Together, those factors make the life-sentenced Williams more deathworthy than Papasavvas.

Thomas Wolfe has a higher level of moral blameworthiness than Papasavvas. Both men murdered elderly females for pecuniary gain. However, Wolfe was classified as emotionally disturbed as a child and had an extensive history of drug abuse, whereas Papasavvas presented more compelling evidence of brain damage and child abuse. With respect to degree of victimization, Wolfe slashed his victim's throat several times, a grotesque injury, and inflicted numerous puncture wounds to her back, leaving her to bleed to death slowly. *See Chew II, supra,* 159 *N.J.* at 219, 731

A.2d 1070 (declaring Chew's sentence proportional in part because of the victim's agony as a result of her throat being slit). To his credit, Wolfe exhibited a more positive character than Papasavvas, having engaged in a number of good Samaritan-type acts prior to his crime which, viewed in conjunction with the absence of a prior criminal record, demonstrates an increased potential for rehabilitation. Overall, however, Wolfe is no less deathworthy than Papasavvas, and therefore his life sentence supports Papasavvas's claim of disproportionality.

### b. *PUBLIC DEFENDER'S PROPOSED COMPARISON CASES*

Other than the fact that Larry Durden was honorably discharged from the U.S. Navy, there is little mitigating evidence in his case. He did not suffer from mental illness, drug addiction, child abuse, or brain damage. Durden was also almost ten years older than Papasavvas at the time of their respective crimes. In addition, following the murder of his seventy-two year-old victim, he attempted to sell the property that he had stolen from her to another tenant, whom he menacingly urged not to "cause waves" about the incident. Durden then gave false information to the police and denied committing the murder. Despite an arguably higher degree of victimization here, we conclude that Durden is at least as culpable as Papasavvas and that his life sentence supports Papasavvas's claim of disproportionality.

There is a fair amount of mitigating evidence in Albert Fains's case. In addition to being honorably discharge from the military, he graduated high school, has a history of limited drug abuse, and was diagnosed with mental and emotional problems. On the other hand, he was older than Papasavvas and had no history of child abuse or brain damage. Furthermore, although Fains's victim did not appear to suffer to the same extent as Mrs. Place (Fains killed his victim by striking him on the head with a hammer), there was evidence that he planned the crime, because he deliberately waited to attack the victim, who was wheelchair-bound, until he was left

alone by his home health aide. We find that Papasavvas's culpability is less than that of Fain.

Harold Perry killed a ninety year-old woman after she invited him into her apartment. He later claimed to have committed the murder in self-defense. In contrast to Papasavvas, however, Perry did not sexually abuse his victim. There was testimony from several witnesses that Perry acted strangely, occasionally conversing with inanimate objects, although he was never officially diagnosed as suffering from any mental disease or defect. And Perry graduated from high school. On the other hand, Perry was Papasavvas's senior by over ten years and had no history of drug abuse. We find that Papasavvas's culpability also is similar to that of Perry.

Charles Ploppert's murder involved a high degree of victimization. Ploppert beat his victim, a blind man, into unconsciousness and then set the house on fire while the victim was still alive. The jury found three aggravating factors present, c(4)(c) (extreme suffering), c(4)(f) (escape detection), and c(4)(g) (contemporaneous felony). Ploppert's case, however, also involved a substantial amount of mitigating evidence. As a child, Ploppert overcame a learning disability to graduate high school. As an adult, he was diagnosed as perceptually impaired with a low range of intelligence. Ploppert had a history of drug addiction and failed treatment. He was only twenty-four years old at the time of the murder and had no criminal history. In our view, Ploppert's life sentence supports Papasavvas's claim of disproportionality.

### c. *ATTORNEY GENERAL'S PROPOSED COMPARISON CASES*

Unlike defendant, Wayne Busby put a significant amount of time and effort into planning his crime, going so far as to case his victim's home. He also knew in advance of his victim's vulnerability. As for mitigating evidence, Busby's jury found mitigating factors c(5)(a) (emotional disturbance) and c(5)(d) (mental disease, defect, or intoxication). Busby also was a high school graduate and was employed at the time of his offense. Still, although

Busby and Papasavvas were both abused as children, Busby did not suffer from brain damage or mental illness, and he had a history of violent prior offenses. Overall, Busby is more death-worthy than Papasavvas.

Aaron Huff and Papasavvas have several factors in common. Both individuals had prior criminal records, were the same age, used drugs, and showed signs of emotional and mental disturbance. Huff could not have been surprised by his victim because he followed him home from a liquor store with the intent to rob him. Huff's murder also exhibited a high degree of victimization. Indeed, the penalty jury found aggravating factor c(4)(c) (aggravated battery). There also was evidence that Huff was drinking heavily on the day of the murder. In fact, the jury found mitigating factor c(5)(d) (mental disease, defect, or intoxication). Huff and Papasavvas are similarly culpable.

Thomas Reigle's crime was considerably worse than that of Papasavvas. Although there was an absence of justification or excuse in both cases, Reigle was related to his victim, his uncle, and thus was certainly familiar with his age and vulnerability when he broke into the apartment to steal money for drugs. Reigle also injured a non-decedent victim, his aunt, during the attack. On the other hand, the mitigation presented in his favor was comparable to Papasavvas's case in that Reigle had emotional and psychiatric problems as a child, was about the same age as Papasavvas, and was high on drugs at the time of the crime. As such, the most that can be said of Reigle is that he is equally as culpable as Papasavvas.

Samuel Rodriguez is less culpable than Papasavvas. Rodriguez was only eighteen years old and under the influence of drugs when he murdered his victim. In addition, Rodriguez suffered from a neurological impairment. Rodriguez beat his victim around the head and strangled her, but he did not sexually abuse her or needlessly prolong her suffering.

Ultimately, the aggravating aspects of George Schaffer's crime make his moral blameworthiness higher than that of Papasavvas.

Schaffer was not surprised by his victim, the landlord of his building, but planned to kill her after she came to him the night before and told him to find another place to live. The following day, he went to his landlord's apartment intending to kill her, take her money and then spend the night drinking. After speaking with her for a few minutes, he beat her with a brass lamp and strangled her with his hands, a chain, and finally the lamp cord. Still, both Schaffer and Papasavvas presented mitigating evidence of similar quality and quantity. Looked at objectively, then, the life-sentenced Schaffer is equally, if not more, deathworthy than Papasavvas.

### d. *CONCLUSION*

Our precedent-seeking review establishes that Papasavvas's death sentence is disproportionate. To recapitulate, Papasavvas is less deathworthy than Nathaniel Harvey, the only other death-sentenced member of his comparison group. In addition, of the remaining seventeen life-sentenced members, all but three—Alvin Adams, Timothy Lee, and Samuel Rodriguez—support Papasavvas's claim of disproportionality. Although we continue to adhere to the basic proposition that a defendant need not be equally culpable to the other death-sentenced defendants, or more culpable than all the life-sentenced defendants, *Martini II, supra*, 139 *N.J.* at 47, 651 *A.*2d 949, we cannot but conclude that Papasavvas has demonstrated that he has been "singled out unfairly" for the death penalty. *Ibid.*

## III. *OTHER ARGUMENTS*

It is unnecessary to reach the remaining arguments because we find Papasavvas's sentence to be disproportionate.

## IV. *CONCLUSION*

Peter Papasavvas has met his burden of establishing that his death sentence is disproportionate. His culpability is less than that of the only death-sentenced defendant in the F–1 category

and equal to or less than fourteen of the seventeen life-sentenced F–1 defendants. When Papasavvas's crime is recategorized and compared with murders involving a sexual offense against a vulnerable victim, the disproportionality of his death sentence becomes even more stark.

Accordingly, we vacate Papasavvas's death sentence and re-mand for sentencing consistent with this opinion.

Chief Justice PORITZ and Justices STEIN, LONG, and ZAZZALI join in this opinion. JUSTICE STEIN has filed a separate concurring opinion. JUSTICE COLEMAN has filed a separate dissenting opinion, in which JUSTICES VERNIERO and LaVECCHIA join.

## APPENDIX

### I. RESIDENTIAL ROBBERY MURDERS: F–1 (AGREED UPON CASES)

#### (1) ALVIN ADAMS

Alvin Adams entered an apartment belonging to an eighty-two-year-old woman while his co-defendant stood watch outside. Adams intended to steal a wallet that he had seen in the apartment several days earlier. He was in the process of removing the money from the wallet when the victim exited the bathroom. The victim ran toward the living room, but began to fall. According to Adams, he grabbed her around the neck and shoulders in an attempt to keep her from falling, but was unable to hold her weight and she collapsed to the ground. Although he claimed that she was still breathing, he covered her with a blanket before leaving the apartment.

After a jury trial, Adams was convicted of murder, felony murder, robbery, burglary, and conspiracy. The case did not proceed to the penalty-phase. On the murder charge, Adams received life imprisonment with a thirty-year parole disqualifier. The AOC coded for aggravating factors c(4)(f) (escape detection)

and c(4)(g) (contemporaneous felony) and for mitigating factors c(5)(d) (mental disease, defect or intoxication) and c(5)(h) (catchall).

At the time of the offense, Adams was thirty-three years old and worked as a maintenance man. As a child, Adams was diagnosed as emotionally disturbed and mentally retarded with passive-aggressive personality traits and poor impulse controls. He had prior convictions for robbery, burglary, larceny, and assault.

### (2) JERRY BRITTON

While burglarizing an apartment, Jerry Britton was confronted by its twenty-four-year-old female occupant. When she went to call the police, Britton rendered her unconscious by choking her. He then retrieved a knife from the kitchen and proceeded to stab the victim sixteen times before stealing a video unit and exiting the apartment. The police discovered the victim's body lying in a corner in a pool of blood. She was naked below the waist and had a knife protruding from her head.

Britton later confided in an acquaintance that he did not know whether he had killed his victim, but he hoped she was dead so that she could not be a witness. After being arrested, Britton gave a sworn statement as to his involvement in the murder and also admitted to having previously burglarized the victim's apartment.

Britton pleaded guilty to felony murder, burglary, robbery, and two weapons charges. In turn, he was sentenced to life in prison with a thirty-year parole disqualifier. The AOC coded as present the c(4)(f) (escape detection) and c(4)(g) (contemporaneous felony) aggravating factors and c(5)(d) (mental defect) and c(5)(h) (catchall) mitigating factors.

At the time of the offense, Britton was twenty-six years old and had been unemployed for approximately one year. Previously, he had worked as an assembler of air conditioners. A high school

graduate, Britton was addicted to heroine. His prior record consisted of a robbery conviction that was downgraded to simple assault.

### (3) *ALPHONSO BRUNSON*

Over a one week period, Alphonso Brunson broke into an eighty-two-year-old woman's home three times. The third time, the woman surprised him. She was found two days later, having died from several severe blows to the head. Brunson later admitted to burglarizing the woman's home three times, but claimed that on the third occasion he was accompanied by a companion who panicked and hit the woman with a table leg. The companion, however, had an alibi.

At the time of the murder, Brunson was twenty-one years old. He was a high school dropout and had a sparse employment history. He had a history of mental disorders. Between the ages of seven and eighteen, he was in more than thirty institutions, hospitals, schools, and foster homes. He had tried to kill himself twice and was diagnosed as being extremely paranoid and schizophrenic. Psychiatrists testified that he lacked impulse control and had the maturity level of a juvenile. He was abused as a child. At the time of his arrest, Brunson was homeless and indigent. Brunson had three prior arrests, two for burglary and one for attempted escape.

Brunson was convicted of several charges, including purposeful murder, felony murder, robbery and burglary. At the penalty phase, the jury found that the aggravating factors did not outweigh the mitigating factors. The jury found two aggravating factors, c(4)(f) (escape detection) and c(4)(g) (contemporaneous felony). The mitigating factors found by the jury were c(5)(a) (emotional disturbance), c(5)(d) (mental disease, defect or intoxication), c(5)(c) (defendant's age), and c(5)(h) (catch-all). Brunson was sentenced to an aggregate prison term of life imprisonment plus fifty years with a mandatory minimum of fifty-one years before becoming eligible for parole.

#### (4) *JESUS DEJESUS*

Jesus DeJesus entered the apartment of a forty-nine-year-old woman who lived below him, stabbed her to death, and stole some of her jewelry. Before leaving the apartment, DeJesus set the bedroom on fire. The woman's remains were later identified by her dental records.

DeJesus's brother informed the police that DeJesus was selling jewelry. The jewelry was subsequently identified as belonging to the victim. When confronted by the police with the jewelry that he had stolen, DeJesus stated that he had not cut the woman. When the police informed him that the cause of death had not been disclosed, DeJesus put his head down and requested an attorney.

DeJesus was charged with murder, felony murder, armed robbery, arson, and armed burglary. He was convicted of all charges and received an aggregate sentence of life in prison plus fifteen years with a thirty-seven and a half year parole disqualifier. The AOC classified DeJesus as having aggravating factor c(4)(g) (contemporaneous felony) and mitigating factor c(5)(h) (catch-all).

At the time of the murder, DeJesus was forty-four years old and living with one of his two daughters. DeJesus left school after the fourth grade and later attended a printing school to learn to operate a printing press. Although he had worked as a Hi-lo driver in the past, DeJesus had been unemployed for two years prior to the crime. DeJesus admitted drinking alcohol three times a week but denied having a drug problem. He had prior convictions for robbery, theft, criminal trespass, possessing drug paraphernalia, and motor vehicle violations.

#### (5) *NATHANIEL HARVEY*

Nathaniel Harvey entered his female victim's home through an unlocked patio door and proceeded to the bedroom, where he was in the process of stealing jewelry from a dresser when the victim awakened and punched him in the nose, causing it to bleed.

Harvey responded by striking the victim in the head with a hammer-like object fifteen times.

After his victim fell to the floor, Harvey changed the blood-stained bed sheets and cleaned the blood off of his victim. He then finished stealing her belongings before fleeing the apartment.

At his first trial, Harvey was found guilty of murder, robbery, and burglary. The penalty-phase jury found no mitigating factors and all three aggravating factors offered by the prosecution, c(4)(c) (torture/depravity), c(4)(f) (escape detection), and c(4)(g) (contemporaneous felony). Harvey was sentenced to death, but we reversed on appeal because of the trial judge's failure to instruct the jury that they were required to find intent to cause death, as opposed to serious bodily injury.

At his retrial, Harvey was again convicted of murder, robbery, and burglary. The penalty phase jury found aggravating factors c(4)(f) (escape detection) and c(4)(g) (contemporaneous felony) and a number of c(5)(h) (catch-all) mitigating factors. The jury concluded that the aggravating factors outweighed the mitigating factors and sentenced Harvey to death.

Born to sharecropper parents, Harvey was raised in poverty and was abused as a child. At age four, Harvey accidentally burned his five-year old sister to death while trying to light a stove in an unheated home. Harvey's prior record consisted of convictions for rape, assault, and battery.

### (6) *FRANKLIN FLOWERS HUDSON*

Franklin Flowers Hudson broke into a home through the basement window. When the homeowner walked down to the basement to do laundry, Hudson forced her at knife-point to the master bedroom, where he tied her up and gagged her. Hudson took a small amount of cash and jewelry. Hudson told her he wanted her boarder's money and car keys. When the boarder, a sixty-year-old man, returned home a short time later, Hudson went downstairs to confront him. The boarder offered his keys

and money, but a struggle ensued and Hudson stabbed the boarder multiple times. The boarder ran upstairs, but Hudson gave chase and struck him over the head with a baseball bat. Hudson then took $201, the boarder's keys, and a red vinyl pouch.

Two and a half months later, the boarder died from his injuries. Hudson confessed to everything except stealing the homeowner's jewelry. He also stated that he was under the influence of cocaine and beer at the time of the crime.

Hudson pleaded guilty to felony murder and received life imprisonment with a thirty year parole bar. The AOC classifies this case as having aggravating factor c(4)(g) (contemporaneous felony) and mitigating factor c(5)(d) (mental disease, defect or intoxication) and c(5)(h) (catch-all).

Hudson was twenty-two years old and was living with his mother, sisters and brother at the time of the killing. As noted above, Hudson was under the influence of cocaine and alcohol when he committed the crime. He had no history of mental illness. Prior to the crime, Hudson had worked as a groom at two race tracks and as a sanitation worker for a disposal company. Hudson had two prior convictions for aggravated assault.

### (7) TIMOTHY LEE

Timothy Lee awoke one morning feeling the need for heroin. He grabbed a knife from the kitchen and drove to the home of a sixty-five-year-old man. Lee forced his way in through the back door. The man awakened to the noise, so Lee approached him and stabbed him in the chest. Lee then took the man's wallet and a bottle of Valium and left. Lee used the money to purchase heroin, but was later stopped by police and gave a full confession.

Lee pleaded guilty to felony murder and was sentenced to thirty years imprisonment with a thirty year parole bar. The AOC classifies this case as having aggravating factor c(4)(g) (contemporaneous felony) and mitigating factors c(5)(d) (mental disease, defect or intoxication) and c(5)(h) (catch-all).

At the time of the killing, Lee was thirty-five years old. He was a plumber by trade and had also worked as a carpenter and computer repair man. He graduated high school and had completed a computer repair course. He had no mental health problems, but was addicted to heroin, and had four prior convictions for possession of marijuana, importing cocaine, shoplifting, and theft by deception.

## (8) *GERALD I. WILLIAMS*

Gerald Williams was walking home with his eight-year-old daughter after buying ice cream when he encountered his friend, J.C. Boyd. Williams and Boyd had some drinks and decided to purchase some drugs. On the way to a friend's apartment, they came across an open door. Hearing a television, they knocked on the door. When there was no answer, they entered the apartment while Williams's daughter remained at the door. Upon entering the apartment, Williams and Boyd found a fifty-one-year-old male asleep on the couch. Williams began to steal a television set, but the man on the couch awoke. Boyd punched the man and pushed him toward Williams, who threw a cover over the man and banged his head against a windowsill. The man broke free, went to the window, and called for help. Williams hit the man over the head and threw him out the window. The man fell three floors to his death. Williams stole some money and the television set.

After a police investigation revealed that Williams and Boyd may have been responsible for the crime, the police took a statement from Williams's daughter. She admitted seeing Williams throw the man out the window. The medical examiner concluded that the man died from being struck on the head by a blunt instrument, and would have died even had he not been thrown from the window.

At his trial, Williams testified that the victim accidentally fell out the window as he attempted to call for help. Williams was convicted of felony murder, burglary, and robbery. He was sentenced to life imprisonment with a parole ineligibility term of

thirty years. The AOC classifies this case as having aggravating factor c(4)(g) (contemporaneous felony) and mitigating factors c(5)(d) (mental disease, defect or intoxication) and c(5)(h) (catch-all).

Williams was thirty-four years old at the time of the murder. Although previously addicted to drugs, Williams underwent a treatment program from 1978 to 1980, and denied any addiction at the time of the murder. He dropped out of school in the tenth grade because he was arrested and subsequently incarcerated. Over the years, Williams was arrested thirty times and served twelve different terms of incarceration as an adult and juvenile.

### (9) *THOMAS WOLFE*

High from cocaine and drunk from alcohol, Thomas Wolfe broke into the home of a seventy-two-year-old female. Wolfe was surprised by the woman, and a struggle ensued. Wolfe slashed her throat three times and inflicted numerous puncture wounds to her back.

A neighbor found the woman's body lying in a pool of blood and covered by a blanket. An autopsy determined that the woman bled to death. After Wolfe's family gave incriminating statements to the police, he surrendered himself.

After a jury trial, Wolfe was convicted of murder, felony murder, burglary, robbery, and weapons charges. In the penalty phase, the jury found aggravating factor c(4)(g) (contemporaneous felony) and mitigating factors c(5)(c) (defendant's age), c(5)(d) (mental disease, defect, or intoxication), c(5)(f) (no significant prior record), and c(5)(h) (catch-all). The jury could not unanimously agree on a sentence, so defendant was sentenced to life imprisonment with a thirty-year parole bar on the murder charge.

At the time of the murder, Wolfe was twenty-two years old, living with his parents, and unemployed. As a school age child, Wolfe was classified as emotionally disturbed and was placed in special education classes. Wolfe dropped out of school in the

eleventh grade and had training in heating/air conditioning repair. Wolfe had an extensive history of drug abuse, for which he repeatedly received treatment. At the penalty phase, Wolfe expressed remorse for killing the woman.

## II. RESIDENTIAL ROBBERY MURDERS: F–1 (SELECTED CASES)

### (1) WAYNE BUSBY

After a twenty-four hour cocaine and alcohol binge, Wayne Busby found himself in need of money for more drugs. To that end, he broke into a neighboring house that belonged to a seventy-four-year-old woman. When the elderly woman confronted him, Busby struck her in the face and ribs before strangling her to death with a broom handle. Busby then stole money and various items from the house before fleeing. At some point after the murder, Busby attempted to take his own life.

A little over two years later, Busby was arrested and charged with purposeful and knowing murder and felony murder. A jury found Busby guilty on both counts. At the penalty phase, the jury found aggravating factors c(4)(g) (contemporaneous murder) and c(4)(h) (escape detection). The jury also found mitigating factors c(5)(a) (emotional disturbance), c(5)(d) (mental disease or defect), and c(5)(h) (catch-all). The jury determined that the aggravating factors did not outweigh the mitigating factors. Consequently, Busby was given a life sentence with a thirty-year parole disqualifier.

Busby was thirty-one years old at the time of the crime. He endured physical and psychological abuse as a child. Although there were no known mental problems, he exhibited bizarre behavior and relatives believed he was unstable. Busby also has a long history of drug abuse and dependency.

## (2) *LARRY DURDEN*

Larry Durden was employed as a security guard in an apartment building. After he changed the locks on a seventy-two-year-old tenant's door, the tenant invited him for dinner. At some point during the dinner, Durden stabbed the tenant in the head and abdomen. Prior to leaving the apartment, Durden stole some groceries, a television set, and a radio.

Durden was caught by police after he tried to sell the stolen items to another tenant in the building. Durden eventually confessed to stealing the items, but denied killing the elderly woman.

After a jury trial, Durden was found guilty of purposeful or knowing murder, felony murder, and burglary. At the penalty phase, the jury found aggravating factor $c(4)(g)$ (contemporaneous felony) and mitigating factor $c(5)(h)$ (catch-all). The jury determined that the mitigating factor was not outweighed by the aggravating factor, so Durden was sentenced to life plus seven years with a thirty year parole ineligibility term.

Durden, who was thirty-one years old at the time of his crime, did not suffer from any emotional or mental problems and was not addicted to drugs. He had a GED and an honorable discharge from the U.S. Navy. Durden did, however, have a prior criminal record.

## (3) *ALBERT FAINS*

Albert Fains lived next door to, and was friends with, the victim, who was confined to a wheelchair. One day, Fains and a female acquaintance visited the victim and smoked marijuana with him. Fains and his female friend left the apartment later that evening, but Fains returned at some point during the night. It was widely known that the victim kept large amounts of cash in the apartment. Fains struck the victim in the head repeatedly with a hammer and stabbed him once in the back. Fains also placed a white trash bag over the victim's head and tied his neck to the

wheelchair with another trash bag. Fains also ransacked the victim's bedroom before fleeing the apartment.

When he was questioned about the murder, Fains gave a false name and changed his story numerous times. After the police found the victim's wrist watch in Fains's apartment, Fains admitted to stealing the watch, but denied any participation in the murder.

Fains was not capitally prosecuted. A jury convicted Fains of purposeful or knowing murder, robbery, felony murder, and possession of a weapon for an unlawful purpose. He was sentenced to life imprisonment with a thirty year parole ineligibility term.

Fains, who was twenty-six years old at the time of the murder, graduated from high school and was honorably discharged from the U.S. Army. He had been diagnosed as having an adjustment disorder with depressed mood and avoidance personality tract. Fains smoked marijuana, but had not received any drug abuse treatment.

### (4) AARON HUFF

While in a liquor store, Aaron Huff recognized a seventy-three-year-old man from the neighborhood buying liquor. Knowing that the elderly gentleman had money on him, Huff broke into his apartment later that night. The man confronted Huff, so Huff threw him to the floor. Huff continued to beat the victim until he stopped moving. Huff took two hundred and seventy dollars, a television set, and a clock-radio. When Huff was arrested, he denied having any knowledge about the murder.

A jury convicted Huff of purposeful or knowing murder, felony murder, and burglary. At the penalty phase, the jury found aggravating factors c(4)(c) (extreme suffering) and c(4)(g) (contemporaneous felony) and mitigating factors c(5)(d) (mental disease) and c(5)(h) (catch-all). After the jury concluded that the aggravating factors did not outweigh the mitigating factors, Huff was given a life sentence.

Huff, age twenty-three, had a prior criminal record. Evidence was presented at the penalty trial that Huff was drug dependent, had an antisocial personal disorder and was mentally still as a child. There was also testimony that Huff was drinking heavily on the day of the murder.

## (5) *HAROLD PERRY*

Harold Perry was employed as a maintenance man in the victim's apartment building. Perry killed a ninety-year-old female tenant by striking her in the head with a hammer. The victim had fourteen lacerations on her face and scalp and three cuts on her hands. Perry also stole some items from the apartment.

Perry initially denied responsibility for the murder, but he subsequently confessed. He claimed, however, that the victim attacked him with the hammer and he acted out of self-defense.

A jury convicted Perry of purposeful or knowing murder, felony murder, and armed robbery. The jury found aggravating factor c(4)(g) (contemporaneous felony) and mitigating factor c(5)(h) (catch-all). Perry received a life sentence with a thirty year parole ineligibility term.

Perry was thirty-four years old at the time of the crime. He was a high school graduate with no history of drug abuse. He had a prior criminal record. There was testimony by several witnesses that Perry occasionally acted strange and talked to inanimate objects.

## (6) *CHARLES PLOPPERT*

Charles Ploppert and an acquaintance planned to strike a forty-one-year-old blind man over the head with a baseball bat when he answered the door bell and then steal his money. That plan was foiled when the blind man answered the door bell through a locked screen door. Consequently, Ploppert was required to identify himself in order to gain access to the home. Once inside, Ploppert beat and kicked the victim until he was unconscious. Ploppert and

the acquaintance then searched the house for money. Before leaving the scene, Ploppert piled some wood on top of the victim and lit him on fire.

Ploppert pleaded guilty to purposeful or knowing murder, robbery, and arson. At the penalty phase, the jury found aggravating factors c(4)(c) (extreme suffering), c(4)(f) (escape detection), and c(4)(g)(contemporaneous felony). The jury also found mitigating factors c(5)(a) (emotional disturbance), c(5)(c)(age), c(5)(d) (mental disease or defect), and c(5)(h) (catch-all). He ultimately received a life sentence plus twenty years.

Ploppert is a high school graduate with learning disabilities. He had a history of drug abuse, but no prior criminal record. A clinical psychologist diagnosed Ploppert as being perceptually impaired with a low range of intelligence and suffering from a serious addiction to methamphetamine and cocaine.

### (7) THOMAS REIGLE

Thomas Reigle resided in a house with his mother, aunt, and uncle. His aunt and uncle shared an upstairs apartment. After returning home high on speed and needing more money to purchase additional drugs, Reigle asked his aunt and uncle to let him into their apartment because he wanted to borrow money. His aunt refused, so Reigle subsequently broke into their apartment. While he was rifling through his aunt's purse, he heard her stirring. He returned to her room and hit her with a motorcycle pipe that he was carrying. Reigle then proceeded to his uncle's room and struck him several times with the pipe. The uncle died from trauma to the head.

Reigle lied to his family that he had been attacked by two men. A short time later, Reigle fled to another state, but he was eventually apprehended. After his arrest, he gave a full confession to police.

Reigle was convicted of purposeful or knowing murder, felony murder, aggravated assault, robbery, and burglary. At the penal-

ty trial, the jury found aggravating factor c(4)(g) (contemporaneous felony) and mitigating factors c(5)(d) (mental disease), c(5)(f) (no criminal history), and c(5)(h) (catch-all). The jury did not find that the aggravating factor outweighed the mitigating factors, so Reigle was sentenced to life imprisonment.

There was evidence presented during Reigle's trial that he suffered from emotional and psychiatric problems. As a child, he was placed on Ritalin to reduce his hyperactivity. Reigle also had a long history of drug and alcohol abuse. He had two prior convictions for drug possession and damage to property. He has no history of mental problems and did not finish high school. He was twenty-four years old when he murdered his uncle.

### (8) *SAMUEL RODRIGUEZ*

An elderly woman allowed Samuel Rodriguez to enter her apartment while Rodriguez was under the influence of drugs. Once inside, Rodriguez pushed her to the ground and she began to bleed. According to Rodriguez, he tried to stop the bleeding, but was unsuccessful, so he just left the woman laying on the couch. He later told his brother and a female acquaintance that he had killed the victim. He was subsequently arrested and confessed to the police.

A jury convicted Rodriguez of murder, felony murder, and robbery. There was no penalty phase and the AOC coded for aggravating factor c(4)(g) (contemporaneous felony) and mitigating factors c(5)(c)(age), c(5)(d) (diminished capacity), c(5)(h) (catch-all). Rodriguez received a life sentence.

Rodriguez was eighteen years old at the time of the offense. As a child, he was placed in a class for socially maladjusted children. He did not graduate high school. He also suffered from a neurological impairment. Rodriguez had a history of drug and alcohol abuse. He also had a prior criminal record.

### (9) *GEORGE SHAFFER*

Around midnight the night before the murder, the victim, George Shaffer's seventy-nine-year-old landlord, knocked on Shaffer's door to ask him to turn down his radio and to tell him that he would have to find another place to live. Defendant turned down his radio. The following day, Shaffer, drunk from a night of drinking, told his Alcoholics Anonymous sponsor that he wanted to kill his landlord and then himself. He was upset because he had seen the woman with whom he was infatuated with another man.

Later that day, Shaffer knocked on his landlord's door. He planned to kill her, take her money and then spend the night drinking. He hoped to avoid being caught for twenty-four hours. The woman let him into her home and they spoke for a few minutes. He then started to strangle her and she fell to the floor. He then picked up a brass lamp and struck her repeatedly on the face and head. He tried to strangle her again with his hands, a chain, and then a lamp cord. When he was certain she was dead, he went to the bathroom and cleaned off the blood from his hands and face. The police apprehended Shaffer at the scene of the crime and he gave a full confession.

Shaffer was convicted of murder, felony murder, armed robbery, and weapon possession. There was no penalty trial and the AOC coded aggravating factor c(4)(g) (contemporaneous felony) and mitigating factors c(5)(d) (diminished capacity), c(5)(f) (no significant criminal record), and c(5)(h) (catch-all). Shaffer received life imprisonment.

He was forty-two years old at the time and was diagnosed as a manic depressive. He had no prior criminal convictions. He did not finish high school and was dishonorably discharged from the U.S. Army. Shaffer was addicted to alcohol and admitted to drug use.

STEIN, J., concurring.

I join in the Court's thoughtful and persuasive opinion. I write separately only to address a narrow but important aspect of the dissenting opinion that, in my view, is based on an erroneous conception of the nature of proportionality review.

The Court's opinion concludes that for purposes of proportionality review, those factual issues that are disputed by the parties but not essential to the jury's verdict should be resolved by accepting the defendant's version for purposes of precedent-seeking review. *Ante* at 478.

Our dissenting colleague concludes to the contrary that "where disputed facts have not been resolved by the jury's guilty or not guilty verdicts, a reasonable inference arises that the jury relied on those facts that are most consistent with its imposition of the death sentence. That generally means accepting the State's version of the facts." *Post* at 523–24.

Our dissenting colleague supports the conclusion that the State's version of disputed factual issues should prevail by characterizing a claim of disproportionality as "in effect, a motion by the defendant to set aside the penalty-phase jury's verdict of death on the ground that it is an aberration." *Post* at 520. Accordingly, the dissent asserts that the appropriate standard to determine which of two conflicting versions of evidence should be accepted in proportionality review proceedings is the standard established under *Rule* 3:18–2 (motion for judgment of acquittal after discharge of jury), and its counterpart for civil cases. That standard requires the Court to consider "whether the evidence, viewed in its entirety, . . . and giving the State the benefit of all of its favorable testimony as well as all of the favorable inferences which reasonably could be drawn therefrom, is sufficient to enable a jury to find that the State's charge has been established beyond a reasonable doubt." *State v. Kluber*, 130 *N.J.Super.* 336, 341–42, 327 *A.*2d 232 (App.Div.1974), *certif. denied*, 67 *N.J.* 72, 335 *A.*2d 25 (1975).

My disagreement with the dissent's justification for resolving disputed factual issues in favor of the State is that it proceeds on the mistaken assumption that proportionality review essentially constitutes a defendant's challenge to the reasonableness of the jury's determination to impose the death penalty. To the contrary, as this Court made crystal clear in *State v. Marshall*, 130 *N.J.* 109, 132–33, 613 *A.2d* 1059 (1999), the primary focus is not on the reasonableness of the jury's sentence of death, but rather on how that sentence compares to jury dispositions in comparable cases:

> We offer this preliminary observation. The Attorney General, in briefs and at oral argument, objects to the inclusion of non-penalty-phase homicide cases in the universe, contending that consideration of such cases questions the correctness of the prosecutor's discretion to seek or not to seek a death penalty in a specific case. In our view, that objection misconceives the issue. *Courts that conduct proportionality review by considering both death-sentenced cases and life-sentenced penalty-phase cases focus not on whether the jury decision was correct*, but rather on whether the differences in the dispositions of comparable homicide cases are relevant to whether the death sentence under review may be disproportionate.
>
> [ (Citations omitted) (emphasis added).]

In the U.S. Supreme Court's landmark proportionality review decision, *Pulley v. Harris*, 465 *U.S.* 37, 43, 104 *S.Ct.* 871, 875–76, 79 *L.Ed.2d* 29, 36 (1984), the Court's opinion described clearly and concisely that the focus of proportionality review is not on the correctness of the jury's verdict in the specific case, but rather on whether the verdict is disproportionate when compared to other defendants convicted of the same offense:

> The proportionality review sought by Harris, required by the Court of Appeals, and provided for in numerous state statutes is of a different sort. This sort of proportionality review presumes that the death sentence is not disproportionate to the crime in the traditional sense. It purports to inquire instead whether the penalty is nonetheless unacceptable in a particular case because disproportionate to the punishment imposed on others convicted of the same crime.

We made virtually the same observation in *State v. Ramseur*, 106 *N.J.* 123, 326, 524 *A.2d* 188 (1987), when Chief Justice Wilentz observed:

> Proportionality review has a function entirely unique among the review proceedings in a capital proceeding. Proportionality review, in the context of a capital sentencing scheme, is not appellate review to ensure that the aggravating factors

outweigh beyond a reasonable doubt all the mitigating factors, L.1985, c. 178, or to determine if the death sentence is disproportionate to the crime in violation of the ban against cruel and unusual punishment. That death is not disproportionate in the sense of being a cruel and unusual punishment is presumed by the nature of the review. Rather, the purpose of review here is "of a different sort.... It purports to inquire instead whether the penalty is nonetheless unacceptable in a particular case because disproportionate to the punishment imposed on others convicted of the same crime." (quoting *Pulley v. Harris, supra,* 465 *U.S.* at 43, 104 *S.Ct.* at 876, 79 *L.Ed.*2d at 36).

[(Citations omitted).]

Justice Brennan's dissent in *Pulley, supra,* also emphasized that the focus of comparative proportionality review is not on whether the jury in the case at hand committed error, but rather on whether a death sentence is disproportionate when compared with the sentences among similarly situated defendants:

Disproportionality among sentences given different defendants can only be eliminated after sentencing disparities are identified. And the most logical way to identify such sentencing disparities is for a court of statewide jurisdiction to conduct comparisons between death sentences imposed by different judges or juries within the State. This is what the Court labels comparative proportionality review. Although clearly no panacea, such review often serves to identify the most extreme examples of disproportionality among similarly situated defendants. At least to this extent, this form of appellate review serves to eliminate some of the irrationality that currently surrounds imposition of a death sentence. If only to further this limited purpose, therefore, I believe that the Constitution's prohibition on the irrational imposition of the death penalty requires that this procedural safeguard be provided.

[465 *U.S.* at 70, 104 *S.Ct.* at 890, 79 *L.Ed.*2d at 53 (Brennan J., dissenting) (citations omitted).]

Our capital punishment act provides precisely the same focus by stating that "[u]pon the request of the defendant, the Supreme Court shall [ ] determine whether the [death] sentence is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." *N.J.S.A.* 2C:11–3(e).

In *In re Proportionality Review Project,* 161 *N.J.* 71, 75–76, 735 *A.*2d 528, this Court observed: "This matter arises out of our exercise of [appellate review of death sentences] and concerns specifically our system for proportionality review of death sentences. *By that we mean not the review of any legal error in the imposition of sentence* but, rather, the review of the sentence

itself. We seek to determine '[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.' " (quoting *Gregg v. Georgia,* 428 *U.S.* 153, 195, 96 *S.Ct.* 2909, 2935, 49 *L.Ed.*2d 859, 887) (emphasis added).

Even the Governor's press release in August 1982 following the Legislature's enactment of the capital punishment statute, L.1982, c. 111, emphasized the equitable nature of proportionality review: "In the event the death penalty is imposed, an automatic review to determine 'proportionality' will be conducted by the State Supreme Court. The review is intended to ensure fairness and equity under the new statute. Execution of sentence would only follow the court's review."

Those descriptions of proportionality review that permeate our jurisprudence demonstrate the inappropriateness of the standard relied on by the dissent. There may be individual cases in which the imposition of the death penalty is allegedly aberrational in the sense that a defendant asserts that the jury imposed the penalty on the basis of impermissible factors such as race, religion, gender or sexual orientation. But as the foregoing extracts from federal and state death penalty jurisprudence emphasize, the broad focus of proportionality review does not typically involve aberrational jury verdicts based on impermissible factors, but rather implicates jury verdicts of death that allegedly are disproportionate because the sentence of death is inconsistent with the death penalty decisions rendered by juries in comparable cases. In fact, Justice Handler, in dissent, often has expressed the view that in applying proportionality review a death sentence should be held to be disproportionate unless death sentences generally are imposed by juries throughout the state for the specific type of capital murder at issue. See *Marshall, supra,* 130 *N.J.* at 266, 613 *A.*2d 1059 (Handler, J., dissenting).

Our understanding of the nature of proportionality review undermines the dissent's formulation that "a claim of individual

disproportionality is, in effect, a motion by the defendant to set aside the penalty-phase jury's verdict of death on the ground that it is an aberration." That characterization is incorrect, and apparently has led the dissent to make an inappropriate comparison between disproportionality review and the standard to be applied under *Rule* 3:18-2 in deciding motions for acquittal notwithstanding a jury verdict. As is self-evident, the defendant seeking proportionality review is not necessarily suggesting that the jury verdict itself is invidious or improper, but rather that it is disproportionate to the verdicts imposed in comparable cases.

Understood in that context, there simply is no justification for this Court to apply proportionality review in cases involving disputed facts not determined by a jury by according the State the benefit of its version of those facts. If the thrust of our inquiry is to determine fairly and objectively whether a death sentence is disproportionate in comparison to sentences in similar murder prosecutions, why should the Court distort its review by assuming the existence of facts adverse to the defendant that never had been determined by the guilt-phase jury? To the contrary as the Court's opinion states, *ante* at 478, "we accept as given all uncontroverted facts and, where facts are disputed, we extract from the jury's findings of guilt and innocence the version of events essential to the verdict." In the rare case where disputed facts are not addressed by the jury verdict, we use the defendant's version for purposes of precedent-seeking review. *Ante* at 479. That standard much more fairly and accurately reflects the Court's supervisory role in conducting proportionality review.

For the reasons stated in the majority opinion, I join in the Court's disposition.

COLEMAN, J., dissenting.

Today, for the first time, the Court finds a defendant's death sentence disproportionate. In the past, the Court has vacated thirty-six of fifty-one death penalties imposed since 1982 because

of trial errors but never because of disproportionality. Significantly, in all of those cases the State was entitled to seek the death penalty in a retrial. The Court's decision today is very different in that the State is forever barred from seeking a sentence of death for the grotesque murder of Mrs. Place. Although I harbor serious concerns in respect of the methodology we use for proportionality review, see Barry Latzer, *The Failure of Comparative Proportionality Review of Capital Cases (With Lessons From New Jersey)*, 64 *Alb. L.Rev.* 1161, 1198 (2001) (referring to Leigh B. Bienen, *The Proportionality Review of Capital Cases by State High Courts After Gregg: Only "The Appearance of Justice"*, 87 *J.Crim. L. & Criminology* 130, 184 (1996)), under the existing paradigm I do not find defendant's death sentence to be disproportionate based on either the undisputed facts or a combination of the undisputed and disputed facts. I respectfully disagree with the Court's holding and therefore dissent.

## I.

"Under our system of capital punishment, a jury of men and women forms the essential link between society and the defendant before the court. Each capital jury expresses the collective voice of society in making the individualized determination that a defendant shall live or die." *State v. Zola*, 112 *N.J.* 384, 429, 548 *A.*2d 1022 (1988), *cert. denied*, 489 *U.S.* 1022, 109 *S.Ct.* 1146, 103 *L.Ed.*2d 205 (1989). My careful examination of the record in this case leads me to conclude that the death sentence was not "wantonly and . . . freakishly imposed" by the jury. *Furman v. Georgia*, 408 *U.S.* 238, 310, 92 *S.Ct.* 2726, 2762, 33 *L.Ed.*2d 346, 390 (1972) (Stewart, J., concurring). Notwithstanding the substantial evidentiary basis to support the jury's individualized determination to impose the death sentence, the Court has concluded that, based on facts in other cases that the jury was completely unaware of, defendant's death sentence should be vacated because of comparative disproportionality.

My substantial point of departure from the opinion of the Court is the determination of the standard to be used in individual proportionality review to resolve disputed factual issues in respect of the capital murder that were not resolved by the jury's verdict and the utilization of the undisputed and disputed facts in this proportionality review. I adopt the majority's recitation of facts and assessment of the frequency analysis stage of this proportionality review, which are sections I and II.A of the majority opinion. I write separately, in dissent, with respect to the remaining sections of the majority decision.

## II.

I agree with the majority that, when conducting individual proportionality review, "[b]oth precedent-seeking review and frequency analysis, especially the sailent–factors component, are fact-driven." *Ante* at 478. I agree that presents a "unique challenge" in this case because the Attorney General and the Public Defender continue to dispute the facts surrounding Mrs. Place's murder. *Id.* at 478. The Attorney General contends that defendant ambushed Mrs. Place and gagged her with a belt after he knocked her to the floor. Defendant then cut off Mrs. Place's clothing piece by piece before sexually attacking her. According to the Attorney General, defendant concluded the assault by strangling Mrs. Place and throwing her down the basement stairs.

The Public Defender, on the other hand, argues that Mrs. Place opened the basement door and surprised defendant, who was hiding in the basement. According to the Public Defender, defendant applied a "sleeper hold" to Mrs. Place to prevent her from screaming, but she accidentally fell down the basement stairs, broke her neck, and died. Mistakenly believing that Mrs. Place was feigning her death, defendant removed her clothes and sexually molested her in an attempt to stop her from pretending to be dead.

In order to convict defendant of the various crimes with which he was charged, the jury was required to resolve certain factual disputes. For example, the Public Defender and the Attorney General contested at trial whether defendant suffered from "diminished capacity." By convicting defendant of capital murder, the jury must have concluded that defendant's diminished capacity did not prevent him from forming the mental culpability required for a knowing or purposeful murder. *State v. Oglesby*, 122 *N.J.* 522, 528, 585 *A.*2d 916 (1991) (observing that "if there is any evidence that defendant suffered from a mental disease or defect that might affect his ability to form an intent to kill, the State must prove beyond a reasonable doubt that such disease or defect did not prevent defendant from acting with the requisite mental state"). Other facts, however, remain in dispute because the jury did not need to resolve them in order to convict defendant of the various offenses. For example, the jury was not required to decide whether defendant ambushed Mrs. Place, or whether Mrs. Place opened the basement door and surprised defendant. In order to conduct precedent-seeking review, however, the Court must decide which facts to use.

Thus, the critical legal issue raised in this case is what standard should be used in individual proportionality review to resolve disputed factual issues surrounding the capital murder that were not clearly resolved by the jury's verdict. The Court adopts the following standard:

> [W]e do not attempt to replicate the jury's deliberate process, an activity that is plainly beyond our purview. Rather, we accept as given all uncontroverted facts and, where facts are disputed, we extract from the jury's findings of guilt and innocence the version of events essential to the verdict. The reason we do that is because we can be sure that the State proved those facts beyond a reasonable doubt.

> [*Ante* at 478.]

Under the Court's standard, it can simply ignore those facts that were not critical to guilt or innocence but were nonetheless highly persuasive in the jury's determination of whether the aggravating factor outweighed any mitigating factors. Those facts are ex-

tremely relevant when deciding whether one case is comparable to another when conducting precedent-seeking review. That death-worthiness determination is made independently of the jury's finding that the defendant committed a knowing or purposeful murder by the defendant's own conduct. Therefore, the standard adopted by the majority converts the Court "from the Court of last resort, *see N.J. Const.* 1947, art. VI, to some sort of super rescue-mission." *Whitfield v. Blackwood,* 101 *N.J.* 500, 501, 502 *A.*2d 1132 (1986)(Clifford, J., concurring). To avoid having the Court act as a "super rescue-mission," prosecutors in all likelihood will request that special interrogatories be submitted to the penalty jury for a determination of disputed death-worthiness facts that are extremely relevant to precedent-seeking review.

A sentence of death is unique both in terms of finality and severity. *State v. Ramseur,* 106 *N.J.* 123, 326–27, 524 *A.*2d 188 (1987). In order to ensure that it is applied in a fair, just, and rational manner, many precautions have been taken. We catalogued some of those precautions in *State v. Marshall,* 130 *N.J.* 109, 613 *A.*2d 1059 (1992)(*Marshall II* ), *cert. denied,* 507 *U.S.* 929, 113 *S.Ct.* 1306, 122 *L. Ed.*2d 694 (1993):

In *Ramseur,* we undertook to "narrow imprecise [c(4)(c)] statutory language in order to render it constitutional." In *Gerald,* we interpreted the Act to limit the sentence of death to those who intended to kill, not just injure. In *Bey II,* we rejected any idea of a mechanical or numerical balancing of factors in the death-sentencing process. We made it clear that jurors must be instructed that it is they who must make the qualitative judgment about who shall live or who shall die. In *Zola,* we recognized the request that defendants be permitted to plead for life at the hands of a jury. In *State v. Davis,* we allowed any relevant evidence bearing on the defendant's potential for rehabilitation to be presented to a jury in a capital-sentencing phase.

[*Marshall II, supra,* 130 *N.J.* at 192, 613 *A.*2d 1059 (citations omitted).]

It is ultimately the jury, however, that must decide whether a specific defendant deserves to die for the murder. The statistics demonstrate that New Jersey juries impose the death penalty sparingly.[8] Thus, once a jury decides to impose the death sen-

---

8 Since 1983, 176 death-eligible cases have reached the penalty phase. *Papasavvas Report,* tbl. 7. Yet, juries have imposed the death penalty in less than one-third of those cases (52/176). *Ibid.*

tence, our role, as a reviewing court, is a limited one. As we explained in *Martini II, supra*, proportionality review is not intended to "validate" the death sentence, but is instead "a vehicle to ensure that the penalty-phase jury's decision is not insupportable." *Martini II, supra*, 139 *N.J.* at 22, 651 *A*.2d 949.

That purpose stems from the mandate of the statutory language itself: "the Supreme Court * * * shall determine whether the sentence is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant". Thus, our search is not for proportionality, but rather one in which our goal is to determine whether the jury's decision to sentence a defendant to death is comparable to decisions reached in the appropriate capital cases in our universe of cases. The question is whether other defendants with similar characteristics generally receive sentences other than death.

The dissent finds "a palpable bias in favor of the proportionality of a death sentence." That bias, if present, does not stem from what our colleague describes as a "selective and convenient rationalization." Rather, our imposing on the defendant the burden of showing disproportionality stems from the statutory language itself, discussed above. It is settled law. We held as much in *Bey IV, supra*, 137 *N.J.* at 343, 349, 645 *A*.2d 685. The dissent unearths nothing new or "treacherous," here. On the contrary, it simply attempts to rewrite established proportionality jurisprudence. Therefore, the statement that the "Court is determined to put the burden of proof on the defendant," although accurate, is hardly a damning accusation.

[*Martini II, supra*, 139 *N.J.* at 22–23, 651 *A*.2d 949 (citations omitted).]

Once the jury imposes the death penalty, the burden shifts to the defendant to prove that his sentence is disproportionate. *Morton II, supra*, 165 *N.J.* at 244, 757 *A*.2d 184; *Chew II, supra*, 159 *N.J.* at 195, 731 *A*.2d 1070; *State v. Bey*, 137 *N.J.* 334, 352, 645 *A*.2d 685 (1994) (*Bey IV*), *cert. denied*, 513 *U.S.* 1164, 115 *S.Ct.* 1131, 130 *L.Ed.*2d 1093 (1995). In other words, a presumption is triggered that the defendant's death sentence is not aberrational.

A claim of individual disproportionality is, in effect, a motion by the defendant to set aside the penalty-phase jury's verdict of death on the ground that it is an aberration. Such a claim requires us to replicate the jury's deliberative process as much as is humanly possible in respect of its role as factfinder. In the absence of special interrogatories, I believe that the best way to accomplish that objective is to conclude that where disputed facts have not been resolved by the jury's guilty or not guilty verdicts, a

reasonable inference arises that the jury relied on those facts that are most consistent with its imposition of the death sentence. That standard is largely guided by the Court's assignment of cases to the single most aggravated cell for salient-factor review based on the recognition that juries are often swayed by the most aggravating characteristics in a case.

Stated differently, I believe that the standard that should be applied to decide which of the conflicting versions of the evidence should be accepted when deciding defendant's aberrational claim is analytically similar to the one established for *Rule* 3:18–2 and its counterpart for civil cases. Under that standard, and here, defendant's application to the Court is to enter judgment for the defendant notwithstanding the verdict, in whole or in part, based on insufficiency of the evidence when compared with similar death-worthy defendants. The standard applied under *Rule* 3:18–2 is the same as that applied in determining a motion for acquittal made either at the end of the State's case or at the end of the entire case. *State v. Kluber,* 130 *N.J.Super.* 336, 341, 327 *A.*2d 232 (App.Div.1974), *certif. denied,* 67 *N.J.* 72, 335 *A.*2d 25 (1975). Under both *Rules* 3:18–1 and –2, the court "is not concerned with the worth, nature or extent (beyond a scintilla) of the evidence, but only with its existence, viewed most favorably to the State." *Kluber, supra,* 130 *N.J.Super.* at 342, 327 *A.*2d 232. Our standard for *Rule* 3:18–2 motions is similar to that approved by the United States Supreme Court. In *Jackson v. Virginia,* 443 *U.S.* 307, 99 *S.Ct.* 2781, 61 *L.Ed.*2d 560 (1979), the Court explained the appellate standard for reviewing the sufficiency of evidence to support a criminal conviction:

> [T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.
>
> [*Id.* at 319, 99 *S.Ct.* at 2789, 61 *L.Ed.*2d at 573 (citation omitted).]

Although a claim of disproportionality is essentially a motion by the defendant to vacate the jury's verdict of a sentence of death, analytically that application is similar to a motion in civil cases for an involuntary dismissal under *Rule* 4:37–2(b) which follows the same standard for determining motions for judgment under *Rule* 4:40–1 at the close of all the evidence or at the close of evidence offered by an opponent, or motions for judgment notwithstanding the verdict under *Rule* 4:40–2. Under that standard, " 'the court must accept as true all the evidence which supports the position of the party defending against the motion and must accord him [or her] the benefit of all legitimate inferences which can be deduced therefrom.' " *Brill v. Guardian Life Ins. Co. of Am.*, 142 *N.J.* 520, 535, 666 *A.2d* 146 (1995) (quoting Pressler, *Current N.J. Court Rules*, comment on *R.* 4:40–2 (1991)). Another way to articulate the same standard is to "treat plaintiff's [or the State's] proofs as uncontradicted." *Evers v. Dollinger*, 95 *N.J.* 399, 402, 471 *A.2d* 405 (1984). Decisions on motions filed pursuant to *Rules* 4:37–2(b), 4:40–1, and 4:40–2, require the trial court to examine the identical evidence presented to the jury. This Court in proportionality review cases in which disputed facts relevant to whether cases are similar for precedent-seeking review have not been resolved by the jury, performs functions similar to those performed by the trial court under *Rules* 3:18–1, 3:18–2, 4:37–2(b), 4:40–1, and 4:40–2. I recognize that the standard I have adopted is not a perfect analogy for proportionality review. But unlike the majority's free-floating standard, my standard is grounded in well-established criminal procedural jurisprudence. I believe that "[l]aws, like houses, lean on one another." Edmund Burke, *Tracts Relating to Popery Laws* (1765), reprinted in IX *The Writings and Speeches of Edmund Burke* 452, 453 (Paul Langford et al. eds.1991).

To summarize, under the standard I would adopt, I conclude that where disputed facts have not been resolved by the jury's guilty or not guilty verdicts, a reasonable inference arises that the jury relied on those facts that are most consistent with its

imposition of the death sentence. That generally means accepting the State's version of the facts. That is not the case, however, with respect to evidence presented solely to establish an element of an offense for which the defendant was acquitted.

In addition to applying such an inference in the present case, there are legal reasons under the New Jersey Criminal Code for rejecting some of defendant's factual-legal assertions. For example, under the Code, a person need not intend the death of his victim in order to be death eligible. It suffices in a purposeful serious bodily injury (SBI) capital murder case if it was "the defendant's conscious object to cause serious bodily injury that then resulted in the victim's death, [when the defendant] knew that the injury created a substantial risk of death and that it was highly probable that death would result." *State v. Cruz*, 163 *N.J.* 403, 417–18, 749 *A.*2d 832 (2000). In a knowing SBI capital murder case, it suffices if "the defendant was aware that it was practically certain that his conduct would cause serious bodily injury that then resulted in the victim's death [when the defendant] knew that the injury created a substantial risk of death and that it was highly probable that death would result." *Id.* at 418, 749 *A.*2d 832; *accord State v. Simon*, 161 *N.J.* 416, 448–49, 737 *A.*2d 1 (1999).

Therefore, in order for defendant to have been sentenced to death in the present case, based on the instructions given to the jury, the jury must have found that defendant by his own conduct purposely or knowingly caused the death of Mrs. Place or intended serious bodily injury knowing that it was highly probable that death would result from the injury. Defendant contends that he only intended to induce Mrs. Place to become unconscious by placing her in a "sleeper hold," but that she died when she accidentally fell down the basement stairs. The prosecutor, on the other hand, argued to the jury that defendant assaulted Mrs. Place, strangled her with his hands and her belt, and threw her down the stairs. It is apparent from the jury's verdict that it rejected defendant's version. If it had believed defendant's ver-

sion, it could not have found him to be death eligible. There is a substantial amount of evidence in the record to support that finding.

Furthermore, the few facts that are disputed do not support defendant's version of how the victim died. For example, defendant presented a diminished capacity defense at trial that was rejected by the jury. He also proposed the diminished capacity mitigating factor at the penalty phase, but it was unanimously rejected. Moreover, defendant's conduct following the murder is not consistent with a diminished capacity defense. Immediately after the murder, defendant placed a call from Mrs. Place's home. He had the presence of mind, however, to first dial *67 so that Mrs. Place's telephone number would not appear on the caller identification box at his house.

The question of whether defendant vaginally and anally raped Mrs. Place is easily resolved because the jury made specific findings on this issue. At the guilt phase the jury acquitted defendant of aggravated sexual assault but convicted him of aggravated sexual contact, a lesser-included offense. Thus the jury found there was no aggravated sexual assault. The aggravated sexual contact found by the jury, however, was bizarre and repulsive in that Mrs. Place's private parts were left exposed and there was evidence that defendant ejaculated near her anus.

Finally, the fact that the jury did not find the c(4)(f) aggravating factor based on an attempt to avoid detection or prosecution for robbery or burglary is not determinative of whether defendant stole the victim's property before or after he murdered her. It is undisputed that defendant burglarized the victim's home before he murdered her. Nonetheless, the jury did not find that the purpose of the murder was to escape detection or prosecution for that burglary. That does not mean, however, that the gravity of the burglary should be minimized. Indeed, defendant has argued to this Court that it was the burglary and not the robbery that led to Mrs. Place's death. As stated previously, I view this case as one

in which both the burglary and the robbery contributed to the murder regardless of whether the property was stolen before or after the murder. *See N.J.S.A.* 2C:15–1a(1). Furthermore, the jury's rejection of the escape detection aggravating factor may not have benefitted defendant in the eyes of the jury because "death-sentencing rates in cases with two or more aggravating factors [are] lower than for those cases with one aggravating factor." *In re Proportionality Review Project, supra,* 161 *N.J.* at 88, 735 *A.*2d 528.

### 1. *RELEVANT FACTORS*

"In comparing defendant to other similar defendants, [the Court] use[s] a three-part model of criminal culpability." *Chew II, supra,* 159 *N.J.* at 210, 731 *A.*2d 1070; *accord Loftin II, supra,* 157 *N.J.* at 336, 724 *A.*2d 129; *DiFrisco III, supra,* 142 *N.J.* at 203, 662 *A.*2d 442. To evaluate defendant's culpability, we consider (1) his moral blameworthiness, (2) the degree of victimization, and (3) his character. *Chew II, supra,* 159 *N.J.* at 210, 731 *A.*2d 1070; *Marshall II, supra,* 130 *N.J.* at 155, 613 *A.*2d 1059.

> We first review defendant's moral blame-worthiness by examining motive, premeditation, justification or excuse, evidence of mental disease, defect, or disturbance, knowledge of helplessness of the victim, knowledge of effects on nondecedent victims, defendant's age, maturity, etc., and defendant's involvement in planning the murder. We then consider the degree of victimization, including the violence and brutality of the murder, and injury to nondecedent victims. Finally, we examine the character of the defendant, including his or her prior record, other unrelated acts of violence, cooperation with authorities, remorse, and capacity for rehabilitation.
>
> [*Chew II, supra,* 159 *N.J.* at 210–11, 731 *A.*2d 1070 (citing *Marshall II, supra,* 130 *N.J.* at 155, 613 *A.*2d 1059) (citations omitted).]

The cases to which the Court compares a specific defendant's case are selected from the universe of cases that is used for frequency review analysis. *State v. Feaster, supra,* 165 *N.J.* at 403, 757 *A.*2d 266.

### a. *DEFENDANT'S MORAL BLAMEWORTHINESS*

Defendant killed Mrs. Place to facilitate the commission of the robbery and burglary. Pecuniary gain is a common motive in the

death-eligible cases, but the fact that defendant could have carried out the underlying crimes without murdering Mrs. Place adds to his blameworthiness. *Feaster II, supra,* 165 *N.J.* at 404, 757 *A.*2d 266. The murder was not premeditated for a significant amount of time. At trial, the prosecutor acknowledged that defendant did not form the intent to murder Mrs. Place until he heard her return home around 10 p.m. Thus, the amount of premeditation was minimal. I agree with the majority that "[t]he record does not suggest any justification or excuse for defendant's crime." *Ante* at 526.

I also agree that during the guilt and penalty phases of the trial, defendant offered substantial evidence of physical brain impairments and psychological impairments. Although I generally accept the majority's analysis of defendant's blameworthiness, I point out that there was no direct evidence about defendant's maturity level, although he was unemployed and lived with his parents. I disagree with the majority's assessment of the facts, however, and find defendant's moral blameworthiness to be relatively high.

### b. *DEGREE OF VICTIMIZATION*

Although there were no living victims, the degree of victimization was extremely high in this case. Defendant assaulted Mrs. Place at the top of the basement stairs. To prevent her from screaming, defendant tied a belt around Mrs. Place's mouth, which made it difficult for her to breathe. After choking her, he threw her body down the stairs. Finally, he cut off her clothes piece by piece and sexually abused her. Because it is unknown at which point Mrs. Place died in the attack, we are unable to assess her level of suffering. However, the Court has held that even short periods of suffering are sufficient to increase the degree of victimization. *See Cooper II, supra,* 159 *N.J.* at 91, 731 *A.*2d 1000; *State v. Harvey,* 159 *N.J.* 277, 314, 731 *A.*2d 1121 (1999); *Loftin II, supra,* 157 *N.J.* at 338, 724 *A.*2d 129.

### c. *DEFENDANT'S CHARACTER*

I agree with the majority that defendant's capacity for rehabilitation is indeed "questionable" given his extensive criminal history. *Ante* at 483. However, I do not accept the majority's view that Papasavvas has a "potential for rehabilitation" especially because I consider his expression of remorse at the time of allocution to have little weight. *Id.* at 484.

### d. *CONCLUSION*

Defendant's overall culpability is moderate to high. Although his moral blameworthiness is above average, the high degree of victimization contributes significantly to his culpability. Ultimately, I find that the aggravating aspects of his character outweigh the mitigating aspects. Accordingly, I find defendant's overall culpability to be relatively high based on the three-part model of criminal culpability.

### 2. *DEFENDANT'S COMPARISON GROUP*

### a. *COMPARISON OF AGREED–UPON CASES*

In certain respects, Alvin Adams was more culpable than defendant. Unlike defendant, Adams planned his burglary and knew in advance that the victim was an elderly female. Adams also had a record of prior violent offenses and was thirty–three years old at the time of the murder. On the other hand, Adams's victim suffered far less than Mrs. Place. Most notably, Adams did not sexually abuse his victim. Further, Adams was diagnosed as mentally retarded. I thus conclude that Adams's life sentence does not support defendant's claim of disproportionality.

Jerry Britton was unexpectedly confronted by his victim during a burglary. A fight ensued, wherein Britton choked and punched the victim and then stabbed her sixteen times. Although the police found Britton's victim naked from the waist down, there is no direct evidence that Britton sexually abused her. Britton was addicted to heroin at the time of the murder. Other than the drug addiction, however, there was no evidence of brain damage, child

abuse, or mental illness. Overall, Britton's life sentence does not support defendant's claim of disproportionality.

There are substantial similarities between Alphonso Brunson and defendant. Both men endured child abuse and displayed signs of emotional and psychological disturbance. In addition, both men were in their early twenties when they committed their respective murders and had prior criminal records. On the one hand, Brunson is more culpable in that he never confessed to murdering the victim. On the other hand, Brunson murdered his victim in a far less brutal manner and there was no evidence of sexual abuse. In my view, Brunson's life sentence does not strongly support defendant's disproportionality claim.

The degree of victimization in Jesus DeJesus's case is similar to that in defendant's case. Although DeJesus did not sexually abuse his victim, he stabbed her and set her apartment on fire before leaving with some of her jewelry. Like defendant, DeJesus had a prior criminal record, but DeJesus was considerably older than defendant. DeJesus had little mitigating evidence. He was drinking regularly around the time of the murder, but he denied having a drug problem. In addition, there was no evidence of child abuse, brain damage, or emotional disturbance. DeJesus's life sentence supports defendant's claim of disproportionality.

Although Nathaniel Harvey could not have been surprised by his victim because he burglarized her bedroom at night, the murder he committed does not appear to have been premeditated because the sleeping victim arose and confronted him. Harvey killed his victim by striking her multiple times in the head with a blunt object; he then washed her body and changed the bloody sheets on her bed to avoid detection. The physician who performed the autopsy concluded that there was a brief interval between the first blow and death. Thus, Harvey's victim did not suffer a great deal. Moreover, Harvey did not sexually abuse his victim. Harvey was more culpable than defendant because he was significantly older and did not suffer from a mental disease or

defect. Harvey also had an extensive prior criminal record that included convictions for rape and kidnapping. Unlike defendant, Harvey did not express remorse for the murder. Although there was no evidence that Harvey was abused as a child, he was emotionally scarred by a childhood episode in which he accidentally set his sister on fire while trying to light a stove. Harvey was given the death sentence on two occasions.

Franklin Flowers Hudson's moral blameworthiness is similar to defendant's moral blameworthiness. Both individuals acted out of a pecuniary motive and were approximately the same age at the time of their respective crimes. Although Hudson did not have a history of mental disease, he was under the influence of cocaine and alcohol when he attacked his victim. With respect to degree of victimization, Hudson stabbed his victim and struck him over the head with a baseball bat. Hudson also tied up and gagged another individual during the robbery, but there was no evidence that he injured her. As for character, Hudson cooperated with authorities by admitting to everything except stealing the homeowner's jewelry. By comparison, defendant continues to contend that Mrs. Place's death was an accident. Hudson and defendant both have criminal records. In short, Hudson and defendant are roughly equally culpable. Thus, Hudson's life sentence supports defendant's claim of disproportionality.

Timothy Paul Lee had no history of mental disease, but was addicted to heroin when he committed his murder. In contrast to defendant, the degree of victimization was low in Lee's case. The victim died from a single stab wound to the chest. Like defendant, Lee had a prior criminal record. Due primarily to the degree of victimization, Lee's sentence does not support defendant's claim of disproportionality.

The degree of victimization in Gerald Williams's case was lower than in defendant's because Williams's victim presumably died instantaneously upon impact after he was thrown from a window. Williams was also drinking on the night of the murder, and so the

AOC coded the c(5)(d) (mental disease, defect, or intoxication) factor as being present. On the other hand, Williams never confessed to the murder, was in his mid-thirties at the time of the offense, and had no history of child abuse or mental illness. In addition, Williams allowed the victim's eight-year old daughter to watch as he killed the victim. Due to the lower level of victimization, however, I find that Williams's life sentence does not support defendant's claim of disproportionality.

Thomas Wolfe and defendant have comparable levels of moral blameworthiness. Wolfe and defendant both murdered elderly females for pecuniary gain. Wolfe did not have a history of child abuse or brain damage, although he was classified as emotionally disturbed as a child and was placed in special education classes. Wolfe also had an extensive history of drug abuse and was under the influence of alcohol and cocaine at the time of the murder. However, Wolfe's crime involved a somewhat lesser degree of victimization. Although Wolfe slashed his victim's throat several times in addition to inflicting multiple puncture wounds in her back, he did not sexually abuse his elderly victim. Approximately the same age as defendant, Wolfe exhibited a more positive character than defendant. He engaged in a number of good Samaritan-type acts prior to his crime which, taken in connection with the absence of a prior criminal record, exhibits an increased potential for rehabilitation. In conclusion, defendant is more culpable than Wolfe. Therefore, Wolfe's life sentence does not lend credence to defendant's claim of disproportionality.

### b. PUBLIC DEFENDER'S PROPOSED COMPARISON CASES

I agree with the majority that

[o]ther than the fact that Larry Durden was honorably discharged from the U.S. Navy, there is little mitigating evidence in Durden's case. He did not suffer from mental illness, drug addiction, child abuse, or brain damage. Durden was also almostten years older than defendant at the time of their respective crimes.

[*Id.* at 530.]

I also note that Durden gave false information to the police. I believe, however, that defendant's case involves greater aggravating evidence. Durden's victim died from a single stab wound to the chest, whereas defendant assaulted, gagged, and threw Mrs. Place down the stairs. Unlike defendant, Durden did not sexually abuse his victim. In view of the additional aggravating evidence in defendant's case, I am unable to conclude that Durden's life sentence supports defendant's claim of disproportionality.

I agree with the majority's evaluation of Albert Fain, Harold Perry and Charles Ploppert. In respect of Fain and Perry, their culpability "is similar," whereas Ploppert's life sentence does not support defendant's claim of disproportionality. *Id.* at 493.

### c. ATTORNEY GENERAL'S PROPOSED COMPARISON CASES

Defendant is more deathworthy than Wayne Busby. In contrast to defendant, Busby's jury found mitigating factors c(5)(a) (emotional disturbance) and c(5)(d) (mental disease, defect, or intoxication). There was some evidence that Busby planned the burglary, but it appears that he was surprised by the homeowner. Like defendant, Busby assaulted and strangled his victim. However, Busby did not sexually abuse his victim and he did not throw her down a flight of stairs. In his favor, Busby was a high school graduate and was employed at the time of his offense. Like defendant, Busby had a history of drug abuse and child abuse, although he did not suffer from brain damage or mental illness.

I also agree with the majority's evaluation of Aaron Huff and consider that Huff and defendant are similarly culpable.

I disagree with the majority's view of Thomas Reigle. In many respects, Reigle and defendant are similar. Reigle murdered his uncle to obtain more money for drugs; defendant murdered Mrs. Place to facilitate the commission of a robbery and burglary. In both cases, there was an absence of justification or excuse. Reigle had no history of mental disturbances, but was high on drugs at the time of the murder. Reigle and defendant were approximate-

ly the same age when they committed their respective crimes. With respect to degree of victimization, defendant's murder was more brutal, but Reigle injured a non-decedent victim. With respect to character, Reigle had no history of mental disturbance, but he was high on drugs at the time of the murder. Yet, Reigle's jury found three mitigating factors: mental disease, defect, or intoxication; no significant criminal history; and the catch-all. Defendant's jury, on the other hand, found a single mitigating factor unanimously, the catch-all factor; another factor, c(5)(a), was found by only three jurors. Thus, Reigle is less deathworthy.

I agree with the majority that "Samuel Rodriguez is less culpable than Papasavvas." *Id.* at 494. Rodriguez was only eighteen years old and under the influence of drugs when he murdered his victim. In addition, Rodriguez suffered from a neurological impairment. Rodriguez beat his victim around the head and strangled her, but he did not sexually abuse her or needlessly prolong her suffering.

George Shaffer is not as deathworthy as defendant because there is stronger mitigation present in Shaffer's case. The AOC coded the mitigating factor for diminished capacity, presumably because Shaffer was intoxicated when he murdered his landlord. By comparison, defendant's jury unanimously rejected the diminished capacity factor. Another difference between Shaffer and defendant is that Shaffer had no prior criminal record. Thus, Shaffer shows a greater potential for rehabilitation. Shaffer also was diagnosed as a manic depressive. Although defendant presented a great deal of evidence relating to brain damage, only three jurors found the *extreme emotional disturbance factor.* Finally, although there was evidence Shaffer planned his crime and had prior knowledge of his victim's age, he gave a full confession to the police, thereby showing a greater willingness to cooperate with law enforcement. Although defendant confessed, he did so to his psychiatrists and he continued to insist that Mrs. Place died accidentally when she fell down the stairs.

The majority has included eight cases in its precedent-seeking review analysis that admittedly fall outside the F–1 cell and that neither the AOC, Public Defender, nor the State sought to have considered: Kevin Conley, Frank Masini, Samuel Mincey, Rafael Rivera, Otis James, Robert Bolinger, Founcill Brockington, and Jerry Spraggins. *Id.* at 485–86. Including those cases is not only contrary to our law since it cannot be argued that they are similar to cases falling into the F–1 cell, but doing so imposes a risk of prejudice to defendant and the State as well. The improper use of those eight cases is corroborative of the majority's willingness to overreach to support its unsound and unwarranted conclusion that defendant's sentence of death is disproportionate.

### d. *CONCLUSION*

It is my opinion that precedent-seeking review does not establish that defendant's death sentence is disproportionate. I find that defendant is more culpable than Adams, Britton, Brunson, Busby, Durden, Ploppert, Lee, Reigle, Rodriguez, Shaffer, Williams, and Wolfe. Those twelve less culpable individuals did not receive death sentences. Consequently, they do not support defendant's claim of disproportionality. The proportionality of defendant's death sentence is further supported by the fact that defendant is as culpable as Harvey, who twice received the death penalty. Defendant is also as culpable as DeJesus, Fains, Hudson, Huff, and Perry, all of whom received life sentences. Although those five cases lend some credence to defendant's claim of disproportionality, "statutory proportionality does not require identical verdicts even in closely-similar cases.... It merely requires that the defendant was not singled out unfairly for capital punishment." *Martini II, supra*, 139 *N.J.* at 47, 651 *A.*2d 949 (citation omitted). It should be noted that none of the comparison cases involved sexual abuse, which is a particularly aggravating factor that adds a great deal to the degree of victimization. Additionally, in contrast to Huff, who knew his victim, defendant was not acquainted with Mrs. Place. Consequently, Huff's case

lacks the specter of randomness inherent in defendant's murder. In sum, when the facts of defendant's case are compared to the other cases, I cannot conclude that he was singled out unfairly. The brutality of his crime, the degree of victimization, and the increased level of premeditation sets his crime apart from the comparison cases.

### III. *OTHER ARGUMENTS*

#### A. *ALLEGED SYSTEMIC DISPROPORTIONALITY*

Defendant argues that racial discrimination in the administration of the death penalty in New Jersey violated his right to equal protection of the laws and subjected him to cruel and unusual punishment. Specifically, defendant contends that cases like his, in which the victim is white, are subject to disproportionate capital prosecution.

In *In re Proportionality Review Project (II)*, 165 *N.J.* 206, 757 *A.*2d 168 (2000), we determined, on the basis of the evidence presently available, that we could not conclude that racial bias or discrimination affects the manner in which the death penalty is applied in New Jersey. *Id.* at 224, 757 *A.*2d 168. Defendant presents no new evidence. Consequently, that argument is rejected.

#### B. *UNCONSTITUTIONALLY LOW RATE OF IMPOSITION*

Defendant contends that because the death-sentencing rate in New Jersey continues to fall and executions are seldomly upheld, the death penalty statute violates the Eighth Amendment's prohibition against cruel and unusual punishment. We have consistently rejected that argument, *Harvey III, supra,* 159 *N.J.* at 319–20, 731 *A.*2d 1121; *Chew II, supra,* 159 *N.J.* at 220–21, 731 *A.*2d 1070; *Cooper II, supra,* 159 *N.J.* at 115–16, 731 *A.*2d 1000; *Loftin II, supra,* 157 *N.J.* at 345, 724 *A.*2d 129; *DiFrisco III, supra,* 142 *N.J.* at 210, 662 *A.*2d 442; *Martini II, supra,* 139 *N.J.* at 79–80, 651 *A.*2d 949; *Bey IV, supra,* 137 *N.J.* at 396, 645 *A.*2d 685;

*Marshall II, supra,* 130 *N.J.* at 188–95, 613 *A.*2d 1059, and do so again today. As we first remarked in *Marshall II, supra,* 130 *N.J.* at 194, 613 *A.*2d 1059, the low rate at which the death sentence is imposed in New Jersey reveals that juries are "fulfilling the Legislature's wish" that the death penalty be reserved for a small segment of the death-eligible cases.

## IV. *CONCLUSION*

Defendant does not meet his burden of establishing that his death sentence is disproportionate under either the standard used by the majority or by me. The undisputed facts support proportionality. Nor has defendant met his burden of proving that racial bias operates as an impermissible factor in New Jersey's death sentencing system. Furthermore, because the majority agrees that based on our current statistical data, "juries view F–1 cases [murder committed during a residential robbery] as average in terms of deathworthiness", *ante* at 476–77, I believe the Court has fallen into serious error in finding defendant's sentence of death to be disproportionate.

Accordingly, I would affirm defendant's death sentence.

Justices VERNIERO and LaVECCHIA join in this opinion.

For affirmance—Justices COLEMAN, VERNIERO, and LaVECCHIA—3.

For vacation and remandment—Chief Justice PORITZ and Justices STEIN, LONG, and ZAZZALI—4.